EHRLICH, MERRILEE, Associate Judge.
The defendant appeals a conviction and sentence for “culpable negligence” child neglect causing serious bodily injury, as a lesser included offense of aggravated manslaughter of a child. She raises nine points which relate to the denial of her motions for judgment of acquittal, several alleged evidentiary errors, and alleged inappropriate comments which the prosecutor made during closing arguments. We conclude that five of these points are meritorious, and reverse and remand for a new trial.
The defendant’s infant son died on February 21, 2007, due to malnutrition and prematurity. The baby was born prematurely at a hospital after thirty-three weeks’ gestation, in September, 2006. He weighed four-and-a-half pounds at birth. For the first three weeks of life, he stayed in the neonatal care unit at another hospital due to his susceptibility to infections.
On January 14, 2007, the defendant brought the baby to the hospital’s emergency room because the baby was consti *386 pated and acting as if he was in discomfort. After the ER pediatrician, Dr. Marchand, examined the baby, he diagnosed the baby with colic and constipation. The baby, then three months and twenty days old, weighed seven pounds, two ounces, having gained three pounds since his birth. The emergency room physician testified that he did not think there was anything seriously wrong with the baby, and he did not even think that the baby suffered from failure to thrive because the baby was not emaciated or dehydrated, and despite being small, was premature. His instructions to the defendant included adding one ounce of water a day between feedings. He also testified that it is not uncommon for parents without insurance, money, or Medicaid to come to the emergency room with their children.
The baby died five weeks later, on February 21, 2007, and weighed six pounds, one-half ounce. Dr. Graham, the medical examiner who performed the autopsy, testified that the baby died of malnutrition and prematurity. He testified that the baby either had not received sufficient food or was not able to process food in a constructive fashion. He concluded that the baby had clearly been fed because he found a small amount of stool in the small and large intestines and a small amount of liquid in the child’s stomach, indicating that the child had been given a bottle the morning of his death. He was unable to determine the exact point the baby was fed, as normal functions tend to slow down with starvation. The stool, however, clearly showed that the baby’s body was able to take in food, swallow it, and then take the compounds from the food and distribute them to the rest of the body. He was unsure what the small amount of nonspecific fluid found in the stomach and large and small intestines meant. However, Dr. Graham further concluded that anyone who saw the baby would know that he needed medical care if they were “people in the United States who are of sound mind.”
Dr. Graham explained that the baby did not look as if he had eaten food or that he was able to use food in order to grow, the loose skin folds over him were striking, his fat was nil, his muscle was greatly reduced, and his ribs could be counted. Dr. Graham otherwise described a baby that looked as though he was starving. He opined that the decline from inability to process food or lack of feeding and lack of hydration would take at least a week, but probably weeks, to occur. The baby may or may not have had a medical condition related to starvation. Dr. Graham said that it is easier to determine the reason for malnutrition in a live child.
Dr. Graham stated, however, that the baby’s condition would have been apparent long before he had cardiac arrest, and that had he been brought to a doctor long before cardiac arrest, he probably would still be alive. He further stated that it was apparent, on February 21, 2007, that the baby needed medical care as he had lost 20% of his body weight since he had been seen by the emergency room doctor in January, weighing six pounds, one-half ounce at the time of death, five (5) weeks later and there would be a reasonable expectation, “when you get into a circumstance of terminal malnutrition,” that the baby will be very listless, almost to the point of “suspended animation.” The cause of death was dehydration and nutritional deprivation with a contributing cause being that the child was born premature. The manner of death was undetermined as to whether it was natural, accidental, suicidal or homicidal.
Dr. Colaizzo, the medical director of the child protection team, testified as to why *387 the baby died. He reviewed all of the baby’s medical records after the fact. His opinion differed from that of the medical examiner. He conceded that he did not know why the baby died, but the baby’s “overall condition was such that this was a child that was clearly in trouble in the days prior to death.” Dr. Colaizzo viewed the photo of the baby taken post-mortem and determined that the baby appeared extremely malnourished and wasted with extremely skinny arms and legs. Dr. Co-laizzo stated that this premature baby could have had a congenital defect in his intestines, which did not form properly and absorb nutrients, or anatomical or metabolic problems, and that often failure to thrive infants have trouble feeding and the choice of food and/or the manner of feeding must be altered accordingly. He testified that while in the neonatal unit of the hospital, when the baby was started on bottles from intravenous feeding, in October, 2006, he was spitting up but when started on lactose-free formula, he was tolerating food.
The opinions of Dr. Colaizzo and the defendant’s expert, Dr. Welty, also differed from those of Dr. Marchand, the emergency room doctor who saw the baby on January 14, 2007. Dr. Colaizzo opined that Dr. Marchand’s instructions to the child’s mother to add one ounce of water to the baby’s intake between feedings could compromise the infant’s nutritional intake and there was no reason to give water to an infant under six months of age unless the baby lived in a really, really hot climate. He agreed with the medical examiner that the baby was being fed, as there was stool in the child’s intestines; however, he opined that, on the day of his death, the child would have appeared listless like survivors of the Nazi concentration camps, and that had the baby been brought to the hospital earlier, he would have survived. He compared the amount of subcutaneous tissue, fat and muscle content relative to a normal sized baby and noted that the dramatic decrease in the baby’s fat and muscle happened over a period of time. In his medical opinion, “the child died of cache-xia, or lack of food, and dehydration.” Although he testified that there are conditions with which one can be born that can do the same, he did not believe that these types of conditions caused the baby’s death, as these other conditions are usually associated with symptoms like chronic diarrhea or vomiting. He believed that the caloric intake was woefully inadequate and that the baby would have survived if he had been brought to a doctor.
Dr. Welty also reviewed the child’s medical records, post mortem. He too came to the conclusion that the baby had been compromised from birth. According to his testimony, the baby had not been orally fed until October 9, 2006, a few days before his discharge from the hospital. At that time, the baby had not adequately adapted to oral feedings and was spitting up. Blood tests done on the baby at the time were quite unusual and not normal. He was greatly concerned that the emergency room doctor, Dr. Marchand, had not done a growth chart on the baby during his hospital visit in January, 2007, as it was his opinion that the baby was already failing and that the doctor’s instructions to give the baby more water would have compromised the child’s caloric intake. He stated that, upon reviewing the histology slides that Dr. Graham made at the autopsy, he found that the child’s lungs were “definitely impaired” which he related to the baby’s premature birth. He explained the difficulty in feeding premature infants and opined that respiratory impairment and malabsorption could not be ruled out as causes of death.
Deputy Umphrey took a voluntary statement from the defendant on the day the *388 child died. She confirmed that the baby was born prematurely and stated that until the date of the baby’s birth, she was unaware of her pregnancy. The defendant was twenty years old and lived with her parents, two brothers, and her sixteen-month old daughter. She was no longer living with her children’s father due to his drug use and other issues. The defendant’s parents helped her care for her children when she went to work. The defendant regularly fed her baby. She denied knowing that anything was wrong with her baby and was at a loss to explain what happened to cause his death.
The defendant’s father testified in the defense case that the baby was always thin, even skinny, but he never saw anything wrong with the baby. He and his wife and their nineteen-year-old son who also lived with them helped care for the baby, gave him bottles, and played with him.
Palm Beach County Fire Rescue Paramedic David Prescott, who responded to an emergency call at 11:45 a.m. on the date of the baby’s death, described the baby as “ashen,” meaning ashy and gray and lifeless. He testified that paramedics found a thin, lifeless baby on the dining room table, with no breath or pulse. Their attempts to resuscitate him were unsuccessful. Prescott wrote in his report that the baby had “thin arms, thin legs, and a prominent rib structure.” Paramedics took the baby to Palms West Hospital where he was pronounced dead.
Dr. Mátese, the emergency room attendant on February 21, 2007 at Palms West, read his report into the record with regard to what the defendant stated: “she put the child down for a nap at 9 am and I checked on him every 5 minutes.” When she found him in respiratory distress, she called 911. According to Dr. Colaizzo’s testimony, it is difficult to estimate the time of death in a baby utilizing body temperature measurement because children lose heat more quickly than adults. He opined, though, that the baby died within hours of the emergency response.
Elizabeth Rodon, a crime scene investigator, testified that she looked for infant foodstuffs in the apartment and found two canisters of infant formula, a box of cereal for babies, a refrigerated half full bottle of white fluid, and a plastic cup with white fluid.
Maria Flores, a former receptionist for Dr. Aquino, the pediatrician who treated the baby’s older sister, testified that there was a record of the defendant bringing the baby’s older sister for an office visit five months after the baby’s death.
The defendant was convicted after a jury trial of the second-degree felony “culpable negligence” child neglect causing serious bodily injury as a lesser included offense of aggravated manslaughter of a child. The trial court, based on three separate grounds for downward departure, sentenced the defendant to eight years of probation with a condition that she serve one year in the county jail. The defendant has already served the jail term component.
The defendant raises the following nine arguments in this appeal:
(1) whether the trial court abused its discretion by sustaining the State’s relevancy objections to evidence of the defendant’s background as a Bosnian refugee;
(2) whether the trial court abused its discretion by sustaining the State’s hearsay objections to the defendant’s father’s testimony that: (a) the defendant was denied Medicaid for the baby; and (b) a local clinic did not see the baby because the defendant *389 did not have a Florida identification card;
(3) whether the trial court abused its discretion by prohibiting the defendant from cross-examining Detective Umphrey on the subject of the defendant’s cooperation in giving other statements at Detective Umphrey’s request after the statement the defendant gave at the hospital on the day the baby died;
(4) whether the trial court abused its discretion by overruling the defendant’s hearsay objection to statements by “the mother” and “EMS” contained in the baby’s February 21, 2007 hospital medical records;
(5) whether the trial court abused its discretion by overruling the defendant’s objection to Dr. Colaizzo’s opinion testimony about the rate at which the baby’s body temperature would have declined after death;
(6) whether the trial court abused its discretion by permitting: (a) Dr. Co-laizzo’s testimony as to how someone could become aware of programs and clinics in the community that provide free medical care to infants to prevent caloric deprivation; and (b) Dr. Aquino’s receptionist’s testimony that she had not seen Dr. Aquino turn anyone away for lack of health insurance;
(7) whether the trial court erred by overruling the defendant’s hearsay and relevancy objections to the receptionist’s testimony that she searched Dr. Aquino’s medical records and found a record for the baby’s older sister, but not for the baby;
(8) whether the trial court erred by denying the defendant’s motions for judgment of acquittal on the basis that the evidence was insufficient to support the conviction for “culpable negligence” child neglect causing serious bodily injury;
(9)whether the trial court sufficiently addressed the prosecutor’s multiple comments during closing argument that were inflammatory and prejudicial to the defendant and were unsupported by the evidence and thus harmless, or whether the comments necessitated a new trial.
We address these arguments in turn below.
First, the defendant argues that the trial court abused its discretion by sustaining the State’s relevancy objections to evidence of the defendant’s background as a Bosnian refugee. “The standard of review for admissibility of evidence is abuse of discretion, limited by the rules of evidence.” Lucas v. State, 67 So.3d 332, 335 (Fla. 4th DCA 2011) (citation omitted). Whether evidence falls within the statutory definition of hearsay is a matter of law subject to de novo review. Id. Here, the trial court was correct to sustain the State’s objection to testimony by the defendant’s father as to background evidence of the defendant and her family being Bosnian refugees to prove the defendant’s state of mind and because the testimony was hearsay and not relevant. Further, some of this testimony was heard by the jury, in any event, and any error was therefore harmless. State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986).
Second, the defendant argues that the trial court abused its discretion by sustaining the State’s hearsay objections to the defendant’s father’s testimony that: (1) the defendant was denied Medicaid for the baby; and (2) the local clinic did not see the baby because the defendant did not have a Florida identification card. Although testimony about the official letter *390 from DCF denying the defendant Medicaid should have been admitted as a verbal act, not hearsay, the failure to admit it was harmless, because the testimony throughout the trial established that the defendant tried multiple times to obtain Medicaid for the baby, but was unable to do so. However, the trial court properly sustained the unresponsive objection to the defendant’s father’s Florida identification card testimony. Defense counsel never addressed the hearsay issue; and defense counsel never asked the defendant’s father if the clinic turned away the defendant because she had an out-of-state identification card rather than a Florida identification card. A correctly phrased question from defense counsel would have elicited an admissible response.
Third, the defendant argues that the trial court abused its discretion by prohibiting her from cross-examining Detective Umphrey on the subject of the defendant’s cooperation in giving other statements at Detective Umphrey’s request after the statement the defendant gave at the hospital on the day the baby died. A defendant has a right to full and complete confrontation and cross examination on issues raised by direct examination. § 90.612(2), Fla. Stat. (2009) (“Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness.”). Detective Umphrey and the defendant spoke on several additional occasions after the date of the baby’s death. The attempts by defense counsel to elicit that these additional interactions occurred was certainly relevant and within the scope of direct examination. The State opened the door to this line of inquiry. What direction further cross-examination might have taken and what doors that might have then opened for the State or for the court, is unknown because the questioning never got that far, as the court improperly sustained the State’s objection. See Boyd v. State, 910 So.2d 167, 185 (Fla.2005); Johnston v. State, 863 So.2d 271, 278-79 (Fla.2003); Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982).
Fourth, the defendant argues that the trial court abused its discretion by overruling the defendant’s hearsay objections to statements by “the mother” and “EMS” contained in the child’s February 21, 2007 hospital medical records. We agree. These were not resuscitative efforts being made bedside on the baby at the time that Dr. Mátese was collecting medically necessary information from the defendant as to what happened the morning the baby died and from EMS about the baby’s body temperature at that time. The EMS information reflected that the baby’s temperature was 80 degrees. Dr. Mátese was the attending physician at the hospital where the baby was taken, post mortem. He testified that he had no recollection of the particulars in the hospital medical records. He was not the custodian of records. Dr. Matese’s entries were one of several individuals’ entries in the baby’s hospital records that date, and read into the record by Dr. Mátese, over the defense’s proper objection.
Fifth, the defendant argues that the trial court abused its discretion by overruling the defendant’s objection to Dr. Colaizzo’s opinion testimony about the rate at which the baby’s body temperature would have declined after death. The defendant failed to preserve the issue for appeal because her objection was untimely. However, “[cjourts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles,” especially from an “expert” witness. Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1202 (11th Cir.2002).
*391 Dr. Colaizzo, the medical director for the child protection team, was asked to opine on how long the baby had been dead when his body temperature of 80 degrees was recorded. He testified that this was not his field, but rather that of the medical examiner. Dr. Colaizzo further stated that the research he had done pertaining to the loss of body temperature in adults and that it is problematic because he was aware that children lose body heat much more quickly than adults and that this baby, having no body fat and being very wasted, would lose heat even more quickly than other children. Despite this, Dr. Colaizzo gave an unchallenged opinion of “hours” without further specificity.
Sixth, the defendant argues that the trial court abused its discretion by permitting: (1) Dr. Colaizzo’s testimony as to how someone could become aware of programs and clinics in the community that provide free medical care to infants to prevent caloric deprivation; and (2) Dr. Aquino’s receptionist’s testimony that she has not seen Dr. Aquino turn anyone away for lack of health insurance. The trial court properly overruled defense counsel’s speculation objection to Dr. Colaizzo’s testimony. In his capacity as Director of the Child Protection Team and as a doctor who works in an impoverished area of Pahokee, it is likely that Dr. Colaizzo had firsthand knowledge of how underprivileged individuals can become aware of places that offer free medical care. Because his response was couched in terms of what people “could” do rather than what they “usually do,” there is no reason to believe that Dr. Colaizzo’s response was based on speculation, and the defendant failed to show otherwise.
Also, the trial court properly overruled defense counsel’s hearsay and relevancy objections to the receptionist’s testimony. The receptionist’s statement was not hearsay because it was based on her personal observations and not on what anyone told her. The statement was relevant because it was necessary to rebut defense counsel’s claim during opening statements that the defendant was turned away from Dr. Aquino’s office for lack of health insurance.
Seventh, the defendant argues that the trial court abused its discretion by overruling the defendant’s hearsay and relevance objections to the receptionist’s testimony that she searched Dr. Aquino’s medical records and found a record for the baby’s older sister, but not for the baby. The defendant’s objections should have been sustained because: (1) the State failed to introduce evidence that the receptionist was a “person with knowledge” under section 90.803(6), Florida Statutes; and (2) as the State concedes, the sister’s records are not directly relevant to the facts of this case as the sister’s visit to Dr. Aquino occurred months after the baby died, and that the defendant had Medicaid for the sister at that time.
Eighth, the defendant argues that the trial court erred by denying her motions for judgment of acquittal on the basis that the evidence was insufficient to support the conviction for culpable negligence child neglect causing serious bodily injury. We review this issue de novo. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). The properly admitted evidence, taken in the light most favorable to the State, is sufficient to establish culpable negligence (the only element at issue) and to refute the defendant’s reasonable hypothesis of innocence that she was merely following the emergency room doctor’s instructions and that the baby appeared normal and behaved normally between the emergency room visit and his death.
*392 Finally, the defendant argues that the State’s closing argument, which she claims contains inflammatory and prejudicial argument, facts not in evidence, and misstatements of the law, necessitates reversal for a new trial. The control of comments during closing argument is within the trial court’s discretion and an appellate court will not interfere unless an abuse of discretion is shown. Thomas v. State, 326 So.2d 413, 415 (Fla.1975). Wide latitude is permitted in arguing to a jury during closing argument. Breedlove v. State, 413 So.2d 1, 8 (Fla.1982). Logical inferences may be drawn and prosecutors are allowed to advance all legitimate arguments with the limits of their forensic talents in order to effectuate their enforcement of the criminal laws. Spencer v. State, 133 So.2d 729, 731 (Fla.1961). A prosecutor is generally allowed a considerable degree of latitude in closing argument. Crump v. State, 622 So.2d 963, 972 (Fla.1993).
“A criminal trial is a neutral arena wherein both sides place evidence for the jury’s consideration; the role of counsel in closing argument is to assist the jury in analyzing that evidence, not to obscure the jury’s view with personal opinion, emotion, and nonrecord evidence.” Fenster v. State, 944 So.2d 477, 480 (Fla. 4th DCA 2006) (citation and alteration omitted) (improper comments by prosecutor during closing argument of attempted murder trial to rebut defendant’s claim of self-defense, which were unsupported by the evidence, were not harmless; trial was no longer a neutral arena considering the number of improper comments, and curative instructions were insufficient). Improper appeal to sympathy in prosecutor’s closing argument is improper. Id. “In order to require a new trial based on improper prosecutorial comments, the prosecutor’s comments must either deprive the defendant of a fan* and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.” Id. at 479 (citation omitted).
The defendant presents a litany of allegedly erroneous prosecutorial comments for this court’s review. Some are preserved, whereas some are not. Some that are erroneous would be harmless were it not for the number and type of other improper prosecutorial comments and the insufficient manner in which the trial court, in some instances, responded to them.
For example, despite the egregiousness of the unsupportable inference that the separation of the defendant from the baby’s father caused the defendant to disconnect and ignore their baby may have been harmless by itself, as the jury apparently ignored the State’s “indifference” argument by acquitting the defendant of aggravated manslaughter, this impropriety did not stand alone.
When raising the defendant’s alleged failure to seek medical attention for the baby after the January 2007 emergency room visit, the State argued that free medical services in Palm Beach County are provided to every indigent person, who cannot be turned away even if they were “illegal” immigrants and without insurance or a Medicaid card. Although the court sustained the defense objection to this characterization, this highly improper, prejudicial, and facts-not-in-evidence description alluding to the defendant as an “illegal immigrant” as opposed to a “refugee,” especially after the State objected to the admissibility of any evidence with regard to the defendant being a Bosnian refugee, is repugnant especially given the *393 current controversial nature of illegal immigration in this country.
Towards the end of closing argument, the prosecutor argued that the defendant’s apartment was so clean when EMS arrived because the defendant’s family had spent the four to five hours between the time that the baby died and the time that they called the police destroying evidence, an uncharged criminal offense. The court sustained defense counsel’s objection on the ground of pure speculation. Although on this occasion, defense counsel did not contemporaneously ask for a curative instruction or a mistrial and thus, under a strict interpretation of the rules of preservation, this argument was unpreserved, see Companioni v. City of Tampa, 51 So.3d 452, 454-56 (Fla.2010), throughout the course of the State’s closing argument, the trial court consistently refused to hear defense counsel at side bar, requesting instead that defense counsel’s motion be made after closing arguments. Thus, defense counsel’s failure to make a contemporaneous motion is somewhat explained. Additionally, after the trial court sustained the objection to this argument, the prosecutor literally said five more sentences before he concluded his closing argument and defense counsel immediately reminded the trial court about the motions that still needed to be heard. The trial court heard those motions after instructing the jurors and sending them back to deliberate.
On three occasions during the State’s closing argument, in addition to overruling defense objections to facts not in evidence and denying motions for a mistrial, the court also told the jurors to rely on their own collective memory, that they were to decide what was evidence and what was not, because “this is argument.” Where, as here, it may have been a close call for the jury and the prosecutor improperly injected facts and inferences that were not supported by the evidence on multiple occasions, which could only mislead and distract the jury from considering the evidence it had heard, the trial court should have affirmatively rebuked the offending prosecutor so as to impress upon the jury the “gross impropriety of being influenced by improper arguments,” Edwards v. State, 428 So.2d 357, 359 (Fla. 3d DCA 1983), and specifically instructed the jury, contemporaneously thereto, that the comments made during closing arguments do not constitute evidence.
This was a “close call” eviden-tiary and testimonial trial with competing experts on the cause of the baby’s death. The unpreserved error can be considered with the preserved error in order to evaluate whether the preserved error is harmless beyond a reasonable doubt. Martinez v. State, 761 So.2d 1074, 1082-83 (Fla. 2000); Ruiz v. State, 743 So.2d 1, 7 (Fla.1999). “While none of these comments in isolation would have required a new trial, this court must look at the entire trial record when considering whether the comments at issue are of such a nature as to destroy the fairness of the proceeding.” Fenster, 944 So.2d at 480; see also DeFreitas v. State, 701 So.2d 593, 596 (Fla. 4th DCA 1997). A mistrial is appropriate only when the error committed was “so prejudicial as to vitiate the entire trial.” Wicklow v. State, 43 So.3d 85, 87 (Fla. 4th DCA 2010). This is one of those cases.

Reversed and Remanded for a new trial.

POLEN, J., concurs.
WARNER, J., concurs specially with opinion.