# Supreme Court of Florida

_____

No. SC13-1257
_____

**WAYNE C. DOTY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[July 9, 2015]

PER CURIAM.

Wayne C. Doty, who at the time of the crime was an inmate at Florida State Prison, confessed to murdering fellow inmate Xavier Rodriguez and later pled guilty to the crime. By a vote of ten to two, the jury recommended that Doty be sentenced to death, and the trial court imposed a death sentence after carefully weighing the aggravating circumstances against the mitigating circumstances. This direct appeal of the judgment of conviction of first-degree murder and sentence of death follows. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

Doty sought to dismiss this appeal or limit the advocacy of his appointed appellate counsel in accordance with his stated desire to be executed. After

ordering responses from the State and Doty's appellate attorney, this Court denied the motion pursuant to Klokoc v. State, 589 So. 2d 219, 221-22 (Fla. 1991), which held that this Court has a mandatory obligation to review all death penalty cases to ensure that the death sentence is imposed in accordance with constitutional and statutory directives—a position agreed to by both appellate counsel and the State. See also Robertson v. State, 143 So. 3d 907, 910 (Fla. 2014) (declining to recede from Klokoc and holding that "there is simply no reason to depart from our reliable, established, and necessary procedure for requiring current counsel to proceed with diligent appellate advocacy to facilitate our mandatory review in death penalty cases where the defendant, in effect, seeks this Court's assistance in being put to death"). Doty, however, was granted permission pursuant to our precedent in Klokoc to submit a pro se brief, expressing his personal positions and interests with regard to the appeal.

For the reasons that follow, we affirm Doty's conviction for first-degree murder and his sentence of death.

**FACTS**

Wayne C. Doty and William Wells were indicted for the first-degree murder of inmate Xavier Rodriguez. Following a hearing pursuant to Farretta v. California, 422 U.S. 806 (1975), the trial court permitted Doty to proceed pro se, but appointed standby counsel. After Doty's and Wells' cases were severed, Doty

conducted his own investigation and chose to plead guilty to the murder. He represented himself during the penalty phase, with standby counsel ready to assist.

The evidence showed that Doty was, at the time of the murder, serving a life sentence for the shooting death of his former employer. Doty was transferred to Florida State Prison (FSP) and was assigned to the "K wing," working as a runner. Each wing at the prison had four runners, who worked in pairs and assisted in numerous duties, including distributing meals to the other prisoners and cleaning common areas. In return, the runners were given certain privileges. Doty's partner as a runner was Wells, who assisted in the murder of Rodriguez, another runner on the K wing.

Doty began planning the murder after the victim, Rodriguez, called Doty names and stole some tobacco from Doty approximately two weeks prior to the incident. In exchange for tobacco, Doty convinced another inmate to make him a knife that he could use to murder Rodriguez. On the evening of May 17, 2011, Doty obtained the homemade knife, which was hidden in a newspaper, when he assisted in picking up inmate food trays after dinner. Doty deposited the knife into a trashcan, which he later retrieved and brought to the third-floor interview room that the runners were permitted to use. Doty then placed the weapon in the duct work there so he could easily retrieve it.

That evening, Doty and Wells carefully watched when the officers made their rounds to determine the best time to kill Rodriguez. After convincing Rodriguez to meet them in the third-floor interview room, Doty and Wells tricked Rodriguez into letting them bind his hands by betting him some tobacco that he could not get out of "Coast Guard handcuffs." After his hands were bound, Doty approached Rodriguez from behind and placed him in a rear chokehold. At first, Rodriguez thought it was a joke but, as Doty explained in his confession, "Once I really got that chokehold locked down, he knew the game was over." After Doty felt Rodriguez "go slack," Doty let Rodriguez's body drop to the floor, and Doty later commented that the body made a "hollow thud" as it hit the floor.

Wells ensured that nobody else entered the room, while Doty pulled the body around the desk and began to stab Rodriguez with the homemade knife. Although Doty admitted that he was hoping to pull out Rodriguez's heart "to make sure he was really dead," the knife was too dull and did not work for that task. Doty and Wells then tied a ligature around Rodriguez's neck, smoked a cigarette, took showers, and, after they were sure that Rodriguez was really dead, called a sergeant working at the prison and confessed to the crime.

Dr. William Hamilton, the medical examiner, testified that the victim died from strangulation and multiple stab wounds. According to Dr. Hamilton, the victim likely lost consciousness within 45-50 seconds, but if the chokehold was

- 4 -

expertly applied, the victim could have lost consciousness in as little as 10-20 seconds. Dr. Hamilton further testified that he believed the victim was still alive when he was stabbed, but was unconscious and close to death, because the victim lost a small amount of blood from the stab wounds and all of the wounds were located very close together, indicating that the victim was not moving during the stabbing.

To establish the aggravating circumstances it sought in arguing for the death penalty, the State presented evidence that Doty was convicted of a prior violent felony based on a previous first-degree murder conviction for shooting his former employer in the face during a robbery—the crime for which he was imprisoned at the time of this murder. The State then called various prison employees to whom Doty had confessed and admitted that he had been planning the murder for weeks, which supported that the murder was cold, calculated, and premeditated (CCP). The State relied on Dr. Hamilton's testimony regarding the manner of death to urge that the murder was especially heinous, atrocious, or cruel (HAC). In addition, the State presented victim impact testimony.

In an attempt to establish nonstatutory mitigation, Doty called two inmates at FSP to explain why an inmate may attempt to resolve a dispute with another inmate instead of requesting prison officials handle the problem. Inmate Clinton Powers testified about prison life and how prisoners could not afford to have a

reputation for being weak or vulnerable. Leo Boatman, another inmate at FSP, testified that Doty was always a respectful person, but in prison, an inmate must appear to be as tough as possible, which is quite different from regular society.

Doty then called Lieutenant Dennis Cauwenberghs, an employee at FSP who supervised the inmates and other prison guards. After a discussion with the trial court, Doty specifically chose to ask Lieutenant Cauwenberghs whether he believed that Doty would be a future threat in the prison—despite the fact that the trial court, his standby counsel, and the prosecutor all warned Doty that he should not elicit this information. Lieutenant Cauwenberghs responded by saying, "I think you've already proven that you could be a threat to other inmates," but also acknowledged that Doty was a good worker.

Dr. Clifford Levin, a licensed psychologist, testified to establish mental health mitigation. Dr. Levin diagnosed Doty with major depressive disorder, post-traumatic stress disorder, and antisocial personality disorder, explaining that Doty sees things as black and white, makes poor decisions, fails to conform, can be aggressive, and shows a great deal of irritability and poor judgment. Dr. Levin testified that three main categories of nonstatutory mitigation existed: (1) Doty's adverse childhood, during which Doty was exposed to physical and emotional abuse by his father and his various stepmothers; (2) numerous untreated psychological disorders that Doty developed over the years; and (3) the failure of

the social and governmental systems on a global scale to treat Doty for his disorders, from school and child protective services to the prison system.

Doty next called numerous family members, who testified regarding Doty's upbringing. Ann Hertle, his former stepmother, testified that Doty's father was physically and mentally abusive to her and that Doty witnessed this abuse. Hertle also admitted that one time, Doty tried to light the carpet on fire so she spanked Doty and then burned his fingers on the stove to teach him the dangers of playing with fire. Shelley Ann Conner, another of Doty's stepmothers, testified that Doty suffered a lot of emotional abuse as a child and was exposed to frequent instances of domestic violence, although Doty himself was not abused.

Doty's father, Randall Doty, admitted that after he returned from his military service in Vietnam, he became an alcoholic and was abusive towards women. Before Doty was two years old, Randall separated from Doty's mother and took Doty with him. Randall did not like how Doty was disciplined by some of his stepmothers and would "get into a tussle" with his former wives. Randall was also concerned when Doty was sent to an alternative school because that school had a "bad environment" that he did not believe was good for Doty.

Other testimony established that Doty had a stepbrother who died after being hit by a semi-truck—a death that Doty asserted affected him greatly. Shortly after that death, Doty committed the murder that placed him at FSP, killing his former

employer in order to buy drugs. Doty also called his biological mother, Mary Cole, who testified that Randall took Doty from her when he was about two years old and she had no way to contact her son and did not see him again until he was fifteen years old, at which time Doty already had a problem with alcohol.

Doty himself was the final defense witness. During his statement to the jury, Doty explained that while his actions were not completely based on his childhood, he did not have emotions anymore. Doty further told the jury, "I don't want to be put in a position where somebody might not make it home to their family. . . . I'm not gonna stop. I'll do it again if I've got to." During cross-examination, Doty admitted that he planned the murder for a long time.

The penalty phase jury recommended, by a vote of ten to two, that Doty be sentenced to death. The trial court held a Spencer[1] hearing, in which Doty presented additional evidence of mitigation, including the testimony of Dr. Harry Krop, who had initially assessed Doty's competence and opined that he was competent to stand trial and to represent himself. Doty also called John Silva, an inmate under the custody of the Florida Department of Corrections who was previously involved in a homosexual relationship with Doty. After their

---

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

relationship ended, Doty attacked Silva with a knife and would have cut Silva's jugular vein if Silva had not deflected the blow.

In addition, Doty called Sergeant Edward Duncan, who testified that he had never witnessed Doty being violent to an officer, but felt Doty had a high expectation for other inmates to respect him. Louise Godfrey, Doty's mitigation specialist, testified that Doty directed much of the penalty phase investigation himself, and all of the mitigation that she found was presented to the trial court. Finally, Doty gave another statement, recognizing once more that he would kill again without remorse if somebody disrespected him. Doty also testified that the juvenile justice system had failed him and that he was unable to obtain mental health treatment as an adult.

The trial court rejected HAC but found three statutory aggravating circumstances applicable to the murder: (1) Doty had a prior violent felony conviction (assigned very great weight); (2) the capital felony was committed by a person under sentence of imprisonment (assigned great weight); and (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (assigned great weight). The trial court weighed this aggravation against seven nonstatutory mitigating factors: (1) Doty was cooperative with authorities and reported the incident (given some weight); (2) Doty was emotionally neglected and abandoned as a child and

exposed to physical abuse (given moderate weight); (3) the prison environment is a different environment from life outside of prison and Doty perceived the victim as a threat in that environment (given very little weight); (4) Doty had a diagnostic and mental health history for emotional disorder (given some weight); (5) Doty perceives violent behavior as acceptable (given little weight); (6) the juvenile justice system failed Doty (given moderate weight); and (7) Doty exhibited good conduct throughout the court proceedings (given some weight). The trial court rejected Doty's proposed mitigation that he had positive attributes that reflected his potential to be a contributing member in a prison setting. After determining that the aggravators outweighed the mitigators, the trial court sentenced Doty to death.

Doty then sought to waive the appellate proceedings in this Court. This initial pro se pleading was struck, pursuant to Davis v. State, 789 So. 2d 978, 981 (Fla. 2001), and appointed counsel was directed to ensure adversarial testing of the judgment and death sentence. Doty v. State, No. SC13-1257 (Fla. Sup. Ct. order filed Dec. 4, 2013). Doty was permitted to submit a pro se filing, setting forth the reasons that he did not wish to pursue the appeal, and to file a pro se supplemental brief that expressed his personal positions. Doty later filed a Motion for Leave to Clarify Appellate Counsel's Role in the Direct Appeal, again emphasizing that he did not wish to pursue the appeal so his appointed counsel should not file a brief on his behalf. Both Doty's appointed attorney and the State filed responses,

recognizing the need for adversarial briefing based on this Court's decision in Klokoc.

This Court, relying on our precedent in Klokoc, and our more recent precedent in Robertson, 143 So. 3d 907, denied Doty's pro se motion to prevent his attorney from filing an adversarial brief, holding that this Court had "important constitutional and statutory obligations to review the legal validity of the conviction and death sentence" and the filing of an adversarial brief would assist this Court in its mandatory appellate review of Doty's judgment of conviction and sentence of death. Doty v. State, No. SC13-1257, slip. op. at 2 (Fla. July 14, 2014). As this Court recognized, Doty's desire to restrict appellate counsel's ability to "prosecute the appeal in a genuinely adversary manner" is inconsistent with the "diligent appellate advocacy addressed to both the judgment and the sentence" that this Court requires in order to assist in the mandatory appellate review of Doty's judgment of conviction and sentence of death. Id. Justice Canady dissented with an opinion, in which Justice Polston concurred, concluding that if Doty "made a knowing, intelligent, and voluntary waiver of his right to appeal," the appeal should be dismissed. Id. at 3 (Canady, J., dissenting).

This analysis of the claims raised by Doty's appointed attorney follows.

## ANALYSIS

Doty's appointed counsel raises four issues on appeal: (1) whether the trial court erred in instructing the jury on HAC; (2) whether the trial court erred in permitting Doty to question a prison correctional officer as to his opinion pertaining to Doty's future dangerousness; (3) whether the trial court erred in permitting the medical examiner to testify in a manner that violated the Golden Rule; and (4) whether this Court should reconsider its precedent regarding the effect of the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), on Florida's capital sentencing scheme. In addition to the claims raised by Doty's appointed counsel, this Court is required to consider whether Doty's guilty plea was knowingly, intelligently, and voluntarily entered. Ocha v. State, 826 So. 2d 956, 965 (Fla. 2002); Fla. R. App. P. 9.142(a)(5). We also have an independent obligation to ensure that the sentence of death is proportionate. Hampton v. State, 103 So. 3d 98, 120 (Fla. 2012); Fla. R. App. P. 9.142(a)(5).

We begin by addressing the voluntariness of the guilty plea and then turn to the claims that Doty's appointed counsel raises. We conclude by analyzing whether the sentence of death is proportionate.

## I. Guilty Plea

As an initial matter, although Doty's appointed counsel has not challenged Doty's conviction for first-degree murder or the acceptance of Doty's guilty plea, this Court has a mandatory obligation to review the basis of Doty's conviction for

first-degree murder, even when there has been a guilty plea. McCoy v. State, 132 So. 3d 756, 765 (Fla. 2013), cert. denied, 135 S. Ct. 90 (2014). "[W]hen a defendant has pled guilty to the charges resulting in a penalty of death, this Court's review shifts to the knowing, intelligent, and voluntary nature of that plea." Winkles v. State, 894 So. 2d 842, 847 (Fla. 2005) (quoting Lynch v. State, 841 So. 2d 362, 375 (Fla. 2003)). Thus, in this case, the Court must "scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily." Id. (quoting Ocha, 826 So. 2d at 965).

A review of the record demonstrates that this standard was met. Doty, who was acting as his own attorney, inquired whether the State would still be seeking the death penalty if he pled guilty, and after learning that the State would still seek that penalty, specifically decided to plead guilty anyway. At the plea proceeding, Doty explained that he wanted to plead guilty because "I'm guilty of the crime, and I wouldn't live with it otherwise without pleading guilty to it." In support, Doty presented a competency evaluation from Dr. Krop. Doty affirmatively stated on the record that he "[c]learly" understood the State was pursuing the death penalty. The trial court further ensured that Doty understood the only two sentencing options during the penalty phase were life imprisonment without the possibility of parole or a sentence of death, that Doty was mentally and physically competent to

make the decision, and that he was not under the influence of any drugs that impaired his faculties.

In a very detailed plea colloquy, the trial court specifically and individually explained the consequences of Doty's plea and apprised him of the various constitutional rights he was waiving as a result. Doty asked the trial court whether his plea of guilty would waive any of his rights in the penalty phase, like the right to call witnesses, to which the trial court explained that Doty retained those rights in the penalty phase. Although Doty was representing himself when he decided to withdraw his original plea of not guilty and tender a plea of guilty to the first-degree murder charge, Doty acknowledged that he had been given a full chance to see the evidence against him and to thoroughly investigate his case. In addition, Doty discussed his understanding of the State's case against him and had carefully considered his defenses and strategy before making the decision, including who he would call as his witnesses in the penalty phase. Throughout the plea colloquy, Doty demonstrated that he understood the legal proceedings, including his preparation of the case and the evidence against him. Doty was questioned extensively about his ability to fully prepare for the trial, and he asserted that he was completely satisfied with his efforts, investigation, and preparation in the case.

A review of the plea colloquy clearly demonstrates that Doty's guilty plea was knowingly, intelligently, and voluntarily entered. The plea colloquy reflects

that Doty affirmatively represented that he was entering the plea of his own volition and had not been coerced or forced into entering the plea. Further, the record shows that Doty clearly understood the rights he was waiving and the consequences of his plea. The factual basis for the plea provides competent, substantial evidence to support the conviction for first-degree murder in this case.

Accordingly, Doty "was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily." Ocha, 826 So. 2d at 965. After a review of the record, we conclude that Doty's plea was knowingly, intelligently, and voluntarily entered, and therefore affirm Doty's conviction for first-degree murder.

## II. Instructing the Jury on HAC

In the next claim we address, Doty's appointed counsel asserts that the trial court erred in instructing the jury on the HAC aggravator, relying primarily on the fact that the trial court rejected this aggravating circumstance in its order imposing the sentence of death. We reject this claim.

As this Court has held, "[t]he trial court must instruct the jury on any aggravators for which credible and competent evidence is presented." Hall v. State, 87 So. 3d 667, 671 (Fla. 2012); see also Welch v. State, 992 So. 2d 206, 216 (Fla. 2008) ("[T]he trial court properly instructed the jury on CCP because the State introduced credible and competent evidence in support of the aggravator.");

- 15 -

Hunter v. State, 660 So. 2d 244, 252 (Fla. 1995) ("A judge should instruct a jury only on those aggravating circumstances for which credible and competent evidence has been presented."). However, we have also recognized that "a trial court's ultimate determination that an aggravating circumstance was not proven beyond a reasonable doubt does not necessitate a conclusion that there was insufficient evidence to allow the jury to consider the factor for purposes of the advisory sentence." Miller v. State, 42 So. 3d 204, 227 (Fla. 2010); see also Davis v. State, 928 So. 2d 1089, 1132 (Fla. 2005).

In Miller, this Court rejected a similar claim that the trial court erred in instructing the jury regarding the avoid arrest aggravator when the trial court later rejected this aggravator as insufficiently proven. 42 So. 3d at 227. As this Court noted, in that case, the State had presented credible evidence to support the aggravator since the defendant admitted that he was contemplating that he did not want to go back to prison. Id. However, conflicting evidence demonstrated a different reason that the defendant killed the victim—he wanted to stop the victim from screaming. Id. Thus, this Court held that the trial court did not err in instructing the jury on this aggravator, even though the trial court ultimately determined that the aggravator was not sufficiently proven. Id.

Similarly, in this case, the State presented credible and competent evidence to allow the jury to consider the HAC aggravator. Specifically, the evidence

- 16 -

showed that the victim was aware and conscious when Doty approached him from behind and strangled him to death. While Doty stated that the victim became unconscious quickly, the medical examiner testified that the victim likely lost consciousness within 45-50 seconds, but that if a chokehold was expertly applied, unconsciousness could occur much sooner. Thus, although the trial court ultimately rejected this aggravator, there was no reversible error in the jury being instructed on the aggravator. Further, considering the quantity and quality of other aggravators that were clearly established by the evidence, including the existence of the prior violent felony of murder for which Doty was imprisoned, the fact that Doty was under a sentence of imprisonment, and the careful planning of the murder establishing the CCP aggravator, any error in submitting the aggravator to the jury would be harmless beyond a reasonable doubt.

Thus, we deny this claim.

### III. Future Dangerousness

In this claim, Doty's appointed counsel asserts that the trial court erred in permitting Doty, who was proceeding pro se, to elicit testimony as to Doty's future dangerousness. We disagree under the circumstances of this case, which demonstrate that Doty was warned about the dangers of admitting this testimony and had discussed this decision with his standby counsel and his mitigation specialist.

- 17 -

After calling Lieutenant Cauwenberghs, Doty stated in a discussion outside the jury's presence that he intended to ask Lieutenant Cauwenberghs whether he believed that Doty would be a future threat, based on his knowledge of Doty and his lengthy employment with the State. The State stressed that it was concerned that Doty was opening the door to prior answers that Doty gave during his confession in which he stated that he could kill again. The trial court informed Doty about the significant dangers as to this line of questioning:

> The Court: So [the State is] not objecting per se, I don't think, to this, as I understand it. I think they're alerting, mostly you and the court, that if you go down that path and get to the point where you ask him what you want to ask him, then you are, quote, opening the door, something that may—the State may not be able to get in otherwise. . . . That by asking the question about that topic, that— what they normally may not be able to get into, you would now have raised the issue, so that's going to allow them to explore that much further and present other evidence possibly that might be different than what you're going to present. It's called opening the door, if you will.
>     . . . .
> Mr. Doty: Your Honor, I understand what you're talking about . . . . I know I'm a layman in this courtroom. Okay. I've hired an investigator, I've hired a mitigation specialist, I've hired a mental health mitigation specialist. This is a cut-and-dry situation right here where I called the man in for his testimony. I know where I'm going, I know what I'm doing, your Honor. I'm doing it legally. I understand what I'm fixing to say is going to open up the door, but I'm taking that chance.

The trial court mandated a fifteen-minute recess so that Doty could consult with his standby attorney and his mitigation specialist. When the proceedings reconvened, Doty stressed that he had a Sixth Amendment right to represent

- 18 -

himself and he wanted to elicit this information. The trial court explained that it had already found him competent and simply wanted to explain "what the pitfall may be" so that Doty could make this strategic decision with his "eyes open and with at least some understanding of what's involved in making the decision."

After the jury returned, Doty elicited the following testimony from Lieutenant Cauwenberghs:

> Q: Lieutenant Cauwenberghs, knowing about the defendant, myself, and your relationship with your officers, being the administrative lieutenant, and being around them, has anyone in your office ever implicated that I could be a future threat to them or other inmates?
> A: I think you've already proven that you could be a threat to other inmates.
> Q: You think I could be a future threat to your officers?
> A: At Florida State Prison, we have 1200 close-management inmates and death row inmates, and we handle all those the same way, and I believe they could all be a threat to security staff or civilian staff.
> Q: The reason I ask you that question, Lieutenant, is because, obviously, I was a runner when this happened, I have been around your officers, as a matter of fact, I've even cleaned up offices where mental health people are, you know, around them, they felt comfortable with me around them, is that correct?
> A: That's correct.
> Q: That's the reason I'm asking you that question. For one, you're a professional, you've been around the institution for a while, you've been around inmates for a while. I wanted your professional opinion so the jury understands your point of view. Have you ever had any of your officers give you a description of what type of worker I am?
> A: I understand you're a good worker.
> Q: And have many of them told you, even to this day, while this is going on, has any of them ever told you I would put him back to work in a heartbeat?

A: They have.

Generally, this Court has held that "arguments of future dangerousness as a basis to impose a death sentence are improper and 'prosecutorial overkill.'" Allen v. State, 137 So. 3d 946, 961 (Fla. 2013) (quoting Teffeteller v. State, 439 So. 2d 840, 844 (Fla. 1983)), cert. denied, 135 S. Ct. 362 (2014). Moreover, the Court has likewise stated that "'the probability of recurring violent acts by the defendant . . .' is not a proper aggravating circumstance in Florida." Walker v. State, 707 So. 2d 300, 314 (Fla. 1997) (quoting Miller v. State, 373 So. 2d 882, 886 (Fla. 1979)). In this case, however, Doty himself made a strategic decision to elicit this type of testimony—despite being cautioned not to—so this is not a situation involving "prosecutorial overkill" where a prosecutor implies future dangerousness as an improper aggravating circumstance to further the argument that a jury should sentence a defendant to death.

Defendants are generally permitted to introduce evidence pertaining to their conduct in prison. See, e.g., Ault v. State, 53 So. 3d 175, 190 (Fla. 2010) (holding that evidence of good conduct in prison can be mitigating in the sense that it might serve as a basis for a sentence less than death). Although Doty's questioning of Lieutenant Cauwenberghs elicited negative information that Doty was considered a future threat, this was information that Doty himself specifically chose to introduce after he was warned about its dangers. This Court has long held that "[a] party

may not invite error and then be heard to complain of that error on appeal." Cox v. State, 819 So. 2d 705, 715 (Fla. 2002) (quoting Pope v. State, 441 So. 2d 1073, 1076 (Fla. 1983)).

Any error now asserted by Doty's appellate attorney was not only originally invited, it was fully discussed by all parties. Both the trial court and the State warned Doty about the dangers in presenting this testimony, and the trial court required Doty to discuss this decision with standby counsel and his mitigation specialist. Regardless, Doty insisted on presenting this testimony and took special effort to ensure the record was clear that he was competent to make this decision and had a constitutional right to make such decisions himself.

The record clearly shows that Doty voluntarily sought to present this type of information. Moreover, his decision was informed and knowing—the trial court and the State warned Doty that this type of evidence could be dangerous and that the State could not introduce it unless Doty opened the door. To further ensure that Doty had sufficient time and information to consider his decision, the trial court stopped the proceedings and required Doty to discuss his decision with standby counsel and his mitigation specialist. Thus, Doty understood the ramifications of his decision and all potential pitfalls. Despite extensive warnings, Doty made a strategic decision to introduce this evidence, and his waiver was on the record.

For all these reasons, we deny this claim.

## IV.  Whether the Trial Court Erred in Permitting the Medical Examiner to Testify in a Manner that Violated the Golden Rule

In this claim, Doty's appointed counsel asserts that the trial court erred in allowing the medical examiner to violate the Golden Rule when he testified about the cognitive experience of someone being strangled and suggested to the jurors that they could imagine what that experience would feel like.  Although we conclude that the medical examiner's testimony was error, because it was not objected to, reversal would be warranted only if it were fundamental error, which we conclude it was not.

Specifically, during the penalty phase, the State called as a witness Dr. Hamilton, who performed the autopsy on the victim.  During the direct examination of Dr. Hamilton, the State elicited the following testimony:

> Q:  Could you describe for the jury, Doctor, what a person goes through while they're being strangled, meaning physiologically speaking, what a person goes through?
> A:  Physiologically and not cognitively you mean?
> Q:  Both, please.
> A:  <u>Having never been in that position myself, I can't speak with real authority, but if one is fully conscious at the time that ligature is applied, or that hands go around the neck to apply pressure, I think anyone in this room can fully imagine what sort of emotions might go through a person's mind if they are cognitive, if they're fully aware what's going on, if they know that a serious effort is being ma[de] to take their life, I mean, you can only imagine what that would be like</u>.
> Now as far as physiologically what happens, strangulation is usually not just the result of closing off the air supply.  It is much

more complex than that. Veins to the head are compressed, and that impedes the return of blood back to the body so the head vessels quickly fill up.

Also, and more importantly, when the neck is compressed in the appropriate spot, a structure called the carotid body, which is found in the high neck right next to the carotid artery on both sides, stimulates the vagus nerve, tells the heart to slow down and eventually stop, so that after a very short period of neck compression, your heart will slow down and it can stop.

(Emphasis added.)

Doty did not object to the now-challenged statement. Thus, in order to be reversible, this alleged error must constitute a fundamental error. Braddy v. State, 111 So. 3d 810, 837 (Fla. 2012). A fundamental error is one that " 'reaches down into the validity of the trial itself' and that a sentence of death 'could not have been obtained without the assistance of the alleged error.' " Snelgrove v. State, 107 So. 3d 242, 257 (Fla. 2012) (quoting Hayward v. State, 24 So. 3d 17, 42 (Fla. 2009)).

This Court has long prohibited Golden Rule arguments, which "invite the jurors to place themselves in the victim's position during the crime and imagine the victim's suffering." Mosley v. State, 46 So. 3d 510, 520 (Fla. 2009). Thus, this Court has held that comments such as, "[Y]ou can just imagine the pain of [the victim]. . . . Imagine the anguish and the pain [the victim] felt," improperly placed the jury in the position of the victim. Garron v. State, 528 So. 2d 353, 358-59 (Fla. 1988). Thus, Dr. Hamilton's comment pertaining to the victim's cognitive experience on being strangled was clearly improper, and the prosecutor should not

- 23 -

have inquired into the subjective perception one would experience when being strangled.

Moreover, this type of question would require an expert witness to testify in a completely speculative manner. As numerous courts have held, "[c]ourts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles," especially from an "expert" witness. Linic v. State, 80 So. 3d 382, 390 (Fla. 4th DCA 2012) (quoting Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, 1202 (11th Cir. 2002)); see also M.A. Hajianpour, M.D., P.A. v. Khosrow Maleki, P.A., 932 So. 2d 459, 464 (Fla. 4th DCA 2006) ("When the expert's opinion is based on speculation and conjecture, not supported by the facts, or not arrived at by recognized methodology, the testimony will be stricken.).

Although the comment was clearly improper, because Doty did not object, it must constitute fundamental error, which it does not. The comment was very brief, and Dr. Hamilton prefaced his comment with his acknowledgment that he had no authority upon which to speak. Immediately after this very brief statement, Dr. Hamilton shifted to discussing how the body itself responds to strangulation. Throughout the rest of Dr. Hamilton's testimony, the trial, and closing arguments, the State did not discuss the improper portion of Dr. Hamilton's testimony.

When considering the appropriate sentence to recommend, the jury heard evidence that the reason Doty was in prison at the time of the murder was because he shot and killed his former employer. The jury also heard evidence that Doty carefully constructed a plan to kill his victim, made plans well in advance so he could obtain all of the necessary items, and then took special efforts to ensure the victim was dead before he reported the murder, even trying to cut out the victim's heart. We conclude that this very brief comment does not constitute fundamental error. See Snelgrove, 107 So. 3d at 257 (holding that a fundamental error in the penalty phase occurs where the sentence of death "could not have been obtained without the assistance of the alleged error").

Thus, we deny this claim.

### V. Whether Florida's Sentencing Statute Violates Ring

In his final challenge, Doty's appointed counsel asserts that the death penalty in Florida violates Ring, 536 U.S. 584. In this case, Doty pled guilty to murdering a fellow inmate after he was serving a life sentence for a prior murder in which he shot a former employer in the face. This Court has "repeatedly held that where a death sentence is supported by the prior-violent-felony aggravating circumstance, Florida's capital-sentencing scheme does not violate Ring." Wright v. State, 19 So. 3d 277, 298 (Fla. 2009); see also Peterson v. State, 2 So. 3d 146, 160 (Fla. 2009). Thus, relief is not warranted on this issue.

## VI. Whether the Sentence of Death is Proportional

Although Doty's appointed counsel does not raise this issue on appeal, this Court has an independent obligation to review the proportionality of a sentence of death regardless of whether it is raised by a party. See England v. State, 940 So. 2d 389, 407 (Fla. 2006); Fla. R. App. P. 9.142(a)(5). In its review, this Court undertakes a "comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Silvia v. State, 60 So. 3d 959, 973 (Fla. 2011) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). In performing this review, this Court considers the totality of the circumstances and compares the case with other similar capital cases. See Duest v. State, 855 So. 2d 33, 47 (Fla. 2003). This Court does not simply compare the number of aggravating and mitigating circumstances, but rather performs a qualitative review of the underlying basis for each aggravator and mitigator. See Silvia, 60 So. 3d at 973.

In this case, the jury recommended that Doty be sentenced to death by a vote of ten to two. The trial court found three aggravating circumstances: (1) Doty had a prior violent felony conviction (assigned very great weight); (2) the capital felony was committed by a person under sentence of imprisonment (assigned great weight); and (3) the capital felony was CCP (assigned great weight).

The trial court weighed this aggravation against seven nonstatutory mitigating factors: (1) Doty cooperated with authorities and reported the incident (given some weight); (2) Doty was emotionally neglected and abandoned as a child and exposed to physical abuse (given moderate weight); (3) the prison environment is a different environment from life outside of prison and Doty perceived the victim as a threat in that environment (given very little weight); (4) Doty had a diagnostic and mental health history for emotional disorder (given some weight); (5) Doty perceives violent behavior as acceptable (given little weight); (6) the juvenile justice system failed Doty (given moderate weight); and (7) Doty exhibited good conduct throughout the court proceedings (given some weight). The trial court rejected HAC as an aggravator and rejected Doty's proposed mitigation that he had positive attributes that reflected a potential for him to be a contributing member to a prison setting. In addition, the trial court carefully analyzed each statutory mitigator provided in section 921.141, Florida Statutes (2013), and rejected all of the enumerated mitigators because Doty did not submit any evidence to support them. The trial court then found that the aggravators outweighed the mitigation and sentenced Doty to death.

Comparing the death sentence in this case to other capital cases, we recognize that this case is exceedingly similar to the facts and circumstances of Gill v. State, 14 So. 3d 946 (Fla. 2009), a case in which the defendant was

convicted of murder after he strangled his cellmate. Similar to this case, Gill had planned to kill an inmate for a substantial time before he killed his cellmate, and then, after the murder, cooperated with authorities and admitted to the murder. Id. at 950-53. Gill killed his cellmate for the purpose of obtaining the death penalty and had previously warned numerous people that he had no intention of spending the rest of his life in prison and would kill again in order achieve this goal. That case involves the same three aggravators that were found in this case: (1) Gill was under a life sentence for a prior murder at the time he murdered his cellmate; (2) Gill had previously been convicted of another capital felony, i.e., the prior murder; and (3) the killing was CCP. Id. at 964. Further, Gill presented significant mitigation, including an uncontested mental illness he had since childhood. Id. at 965-67. This Court found that the sentence of death was proportional. Id. at 965-66; see also Kilgore v. State, 688 So. 2d 895 (Fla. 1996) (holding that the sentence of death was proportional after the defendant stabbed a fellow inmate to death, where the trial court found two aggravators—the defendant was under a sentence of imprisonment at the time of the murder and was previously convicted of a felony involving the use or threat of violence—and weighed those aggravators against two statutory mitigating factors and three nonstatutory mitigating factors).

Accordingly, we hold that the sentence of death is proportional to other cases in which the sentence of death was upheld.

# CONCLUSION

After a thorough review of all the issues raised by Doty's appointed counsel, Doty's pro se brief setting forth his desire to be executed, and our own independent review of the voluntariness of the guilty plea and propriety of the death sentence, we affirm Doty's conviction for first-degree murder, and we also affirm his sentence of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Bradford County,
    James P. Nilon, Judge - Case No. 042011CF000498CFAXMX

Nancy Ann Daniels, Public Defender, and William Carl McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Patrick M. Delaney, Assistant Attorney General, Tallahassee, Florida,

    for Appellee