# Supreme Court of Florida

------------

No. SC20-466

------------

**BARRY A. NOETZEL,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

November 10, 2021

PER CURIAM.

Barry A. Noetzel appeals his judgment of conviction of first-degree murder and sentence of death. We have jurisdiction, *see* art. V, § 3(b)(1), Fla. Const., and for the reasons below affirm Noetzel's conviction and sentence of death.

## BACKGROUND

While serving a life sentence at Mayo Correctional Institution, Noetzel joined with his cellmate, Jesse Bell, in developing a plan to murder corrections officer James Newman, whom they disliked, and a fellow inmate, whom they would select at a later date. They

reduced their plan to writing in the following twelve steps, which

they titled "Countdown To Extention" [sic]:

1. Get on vegan diet
2. Get multiple tools
3. Get diagram of area
4. Find a gofer
5. Baby powder?
6. Patience!!!!
7. Pick a dick sucker
8. Background check on dick sucker
9. Pick a date
10. Commence dry runs - rehearsals
11. Exicute [sic]!
12. Work on spelling!!

In accordance with their plan, Noetzel and Bell got on a vegan

diet, which allowed them greater access to the area of the kitchen

where Officer Newman worked. They used other inmates to scout

the layout of the kitchen, drew a diagram of the area where Officer

Newman worked, and obtained pieces of metal and fence, which

they sharpened into weapons. They also selected their fellow

inmate Donald H. Eastwood, Jr., to kill because they believed him

to be homosexual and a child molester.

On June 26, 2019, after Noetzel lured Eastwood to his and

Bell's cell, Noetzel stabbed Eastwood in the eyes using their

homemade weapons while Bell restrained and manually choked

Eastwood.  Noetzel hung up a sheet to prevent anyone from seeing inside the cell, and after confirming Eastwood was dead, Noetzel and Bell covered Eastwood's body with a blanket and hid the body under a bunk in the cell.  They also cleaned up Eastwood's blood with a towel and hung up a note in their cell that read, "GOD HATES FAGS[.]  FAGS HATE GOD!  KILL ALL FAGS AND CHO-MOES!  (And Any C.O.'s Who F*ck with You!)."

Noetzel and Bell then went to the prison's dining area, where they attempted to stab Officer Newman to death with another of their homemade weapons.  Other officers intervened in the attack on Officer Newman, who was seriously injured but survived; apprehended Noetzel and Bell in the dining hall; and discovered Eastwood's body in Noetzel and Bell's cell, after Bell told a corrections officer that there was a dead "chomo" in his cell, with "chomo" being prison slang for "child molester."

Both Noetzel and Bell subsequently waived their *Miranda*[1] rights and provided detailed confessions to law enforcement.  As the

---

1.  *Miranda v. Arizona,* 384 U.S. 436 (1966).

trial court's sentencing order accurately reflects, with respect to the first-degree murder of Eastwood, Noetzel

> admitted that, after luring Mr. Eastwood to [the] cell [Noetzel shared with Bell], [Noetzel] stabbed Mr. Eastwood in the left eye, and his codefendant [Bell] grabbed Mr. Eastwood from behind and began to "choke him out." Mr. Eastwood did not immediately die, so [Noetzel] attempted to stab him in the right eye while [Bell] continued to "choke out" Mr. Eastwood. At some point during the attack, Mr. Eastwood began to question the attack or beg for his life. Additionally, when [Bell] initially released tension on Mr. Eastwood's neck, Mr. Eastwood seemingly gasped for air. This caused [Bell] to continue to strangle Mr. Eastwood even after he fell to the ground. Eventually, Mr. Eastwood succumbed to these injuries and died.

Consistent with Noetzel's description of the killing, the medical examiner testified that Eastwood's cause of death was "sharp force trauma to the left eye and brain[,] with neck compression," that the manner of death was homicide, and that the puncture wound to Eastwood's left eye—which was "badly wounded" and "basically just a bloody pulp"—would have been "particularly painful."

Noetzel and Bell were jointly indicted on October 29, 2019, in a five-count indictment for the first-degree premeditated murder of Eastwood; the attempted first-degree murder of Officer Newman with a weapon; and conspiracy to commit the first-degree murder of

- 4 -

Officer Newman. In the fourth and fifth counts, Noetzel and Bell were each indicted, respectively, on one count of possession of a weapon by an inmate.

### Noetzel Requests to Exercise His Right to Self-Representation and to Plead Guilty

At Noetzel's first appearance and arraignment, after appointed counsel entered a plea of not guilty on his behalf, Noetzel personally addressed the trial court, stating that he would like a speedy trial, that he "want[ed] to enter a plea of guilty right now," and that he wanted to represent himself and waive his right to counsel. The presiding judge informed Noetzel that he was filling in for the trial judge, and that it would be up to the assigned judge to conduct the *Faretta*[2] hearing required by Noetzel's unequivocal request for self-representation. The presiding judge also told Noetzel, "[I]f you want to put that in writing, that you want to represent yourself, by all means, do that," so that the assigned judge could "consider [it] at the appropriate time."

---

2. *Faretta v. California*, 422 U.S. 806 (1975).

Thereafter, Noetzel put his pro se requests in writing, filing a demand for speedy trial, a motion to proceed pro se, and a motion to discharge appointed counsel. Noetzel then filed a pro se "notice of inquiry" and a pro se motion to compel a hearing. In addition, Noetzel filed a pro se letter questioning why no hearing had been held on his motion to proceed pro se; in the letter, Noetzel reiterated that he had "attempted to enter a plea of guilty on all charges" at his arraignment. Noetzel's pro se letter explained his strategy:

> I fully understand the dictates of *Faretta* and am knowingly and intelligently waiving my right to counsel. Thereafter, I will be entering a plea of guilty to preserve judicial resources and bring closure to all parties concerned with the outcome of this case.

Following Noetzel's pro se filings, three proceedings relevant to the issues raised in this appeal occurred: (1) a motion hearing, at which the trial court granted Noetzel's request for self-representation, found Noetzel competent, and accepted Noetzel's guilty plea, (2) a bench penalty-phase proceeding that occurred after an expert evaluated Noetzel and found him competent, and (3) a final penalty-phase hearing that occurred after the presentence investigation (PSI).

## I. THE MOTION HEARING

### The Trial Court Conducts a *Faretta* Inquiry and Grants Noetzel's Request for Self-Representation

On January 21, 2020, the trial judge assigned to Noetzel's case held a hearing on Noetzel's pro se motions. At the hearing, Noetzel personally addressed the court and listed his requests, namely that he wished to discharge counsel, represent himself, enter a plea of guilty on all charges, demand a speedy trial, "waive all [of his] rights to a jury," and be sentenced by the trial court.

The trial court first addressed Noetzel's request to invoke his right to self-representation by conducting a *Faretta* inquiry. The lengthy inquiry included explanations by the trial court of the advantages of counsel and the disadvantages of self-representation, all of which Noetzel indicated that he understood. Noetzel's responses to the trial court's questions went beyond simple "yeses" and "noes." For example, in response to the trial court's question as to whether Noetzel had "any questions about the dangers and disadvantages of representing [himself]" that the trial court had explained, Noetzel responded, "Oh, what does it say, a lawyer that represents himself has a fool for a client." Noetzel then stated that

he was "still prepared to go forward with it," even though he understood it was "[c]ompletely inadvisable" to proceed on his own. In response to follow-up questions by the trial court as to why he wanted to represent himself despite knowing it was inadvisable to do so, Noetzel explained that he wanted to quickly plead guilty because, "I am guilty. There's no, if and buts about it. I did what I did. Got no problem with it."[3]

During the *Faretta* inquiry, the trial court also questioned Noetzel as to whether he had "ever been diagnosed and/or treated for any mental illness or disorder." Noetzel responded, "Depression." The trial court followed up by asking Noetzel if he was taking any medication, and when Noetzel said he was not "at this moment," the trial court questioned whether Noetzel had been prescribed medication. When Noetzel said yes, the trial court asked

---

3. Other examples of Noetzel's level of engagement with the trial court during the *Faretta* inquiry include that Noetzel appeared to banter with the trial court in discussing the potential deportation consequences of a guilty plea or conviction, stating "I really like the United States of America, sir," and in discussing the possible consequences of a conviction if a sex-offender statute applied to any of his prior convictions, stating, "I like that law and I don't fall under it."

Noetzel to explain why he was not taking his prescribed medication, and Noetzel said that he "wanted to have a clear mind before I got to this point." Then, the following exchange occurred between Noetzel and the trial court:

> **THE COURT:** Okay. Does the medication cloud your mind?
>
> **THE DEFENDANT:** No, sir, but I just wanted to make sure I didn't have anything in my system because I knew that this was going to be one of the questions that would be asked.
>
> **THE COURT:** All right. So does the medication help you to understand or hinder your ability to understand?
>
> **THE DEFENDANT:** It's a low grade -- I don't remember the name of it, it's in my file, for depression, but it's also for back pain because I have chronic back pain, but because it's a psych med, it's registered that way.
>
> **THE COURT:** All right. . . . [T]hen I assume, if there is an effect, it would cloud your ability to understand, affect your ability negatively to understand?
>
> **THE DEFENDANT:** No, sir.
>
> **THE COURT:** It doesn't?
>
> **THE DEFENDANT:** No, sir.
>
> **THE COURT:** Does it enhance your ability to understand, the medication?
>
> **THE DEFENDANT:** No, it just kind of keeps me calm.
>
> **THE COURT:** Okay. But --
>
> **THE DEFENDANT:** There's no positive or negative to it except for what I take for my back.
>
> **THE COURT:** But it doesn't affect your ability to understand or comprehend anything about what's taking place?
>
> **THE DEFENDANT:** No, sir.

> **THE COURT:** Do you feel that you're fully capable currently as you sit here now without your medication to understand and comprehend everything that you and I are talking about?
>
> **THE DEFENDANT:** Yes, sir.

The trial court then moved on to additional lines of inquiry, including whether, if Noetzel were permitted to represent himself, he would accept standby counsel. After the trial court explained the role of standby counsel, Noetzel said he understood and confirmed his desire for standby counsel.

Before ruling on Noetzel's request for self-representation, the trial court inquired of the State and Noetzel's then-appointed defense counsel as to whether either suggested further lines of inquiry. Defense counsel suggested that the trial court should use the procedure followed in another recent capital case, where the trial court "appointed a couple of doctors to evaluate [the defendant] to make sure that he was competent to make the decisions to represent himself." Counsel's suggestion prompted the following exchange:

> **THE COURT:** Okay. And there's no reason, though, to do that before the Court making a determination whether Mr. Noetzel understands what's taking place here today in his request to represent himself?

- 10 -

[DEFENSE COUNSEL]: Well, I've not seen any reason personally to doubt that Mr. Noetzel is competent to make the decision to represent himself, but I'm not an expert.

THE COURT: Certainly. And I understand that. Mr. Noetzel, what [counsel] is saying and what I'm going to do, whether I allow you to represent yourself at this stage or not, is appoint an expert to have you evaluated just to ensure. I don't see any reason to believe in any way that you're incompetent to proceed.

THE DEFENDANT: Thank you, sir.

THE COURT: But I'm going to have that evaluation done out of the abundance of caution because of the severity of the possible sentences here. Do you understand that?

THE DEFENDANT: Yes, sir.

Following this exchange, the trial court granted Noetzel's request for self-representation and appointed the public defender's office as standby counsel.

### The Trial Court Makes Additional Findings Regarding Self-Representation, Renews the Offer of Counsel, Accepts Noetzel's Guilty Plea, and Finds Noetzel Competent

Immediately after ruling that Noetzel could represent himself, the trial court addressed Noetzel's request "to either demand a speedy trial or enter a plea," and explained to Noetzel that he could demand a speedy trial if he wanted to go to trial, but that if he wanted to plead guilty, he would be "giving up [his] right to a trial." Noetzel stated, "I would like to plead guilty." The trial court then

- 11 -

recessed so that Noetzel could read the offer of plea that the State

had prepared. When the hearing resumed, the State represented

that Noetzel had read and signed the offer of plea form.

Before addressing Noetzel's plea, the trial court made the

following, additional ruling with respect to Noetzel's request for self-

representation:

> Mr. Noetzel, I already advised you, if I didn't, that
> I'm going to allow you to represent yourself. Mr.
> Marshburn and his office, the Office of the Public
> Defender, will be appointed at your request only as
> standby counsel and that the decisions that you'll be
> making with [sic] be yours. If you have any questions
> you don't want to ask me, you can ask Mr. Marshburn. .
> . . And that I do find it to be freely and voluntarily
> entered, and knowingly as well.

Next, the trial court asked whether Noetzel was "withdrawing

[his] speedy trial demand and wanting to enter a plea," and Noetzel

confirmed that was correct. The trial court then renewed the offer

of counsel, which Noetzel rejected. Before accepting Noetzel's plea,

the trial court explained the consequences of pleading guilty to all

four of the charges, including that the penalty Noetzel would receive

for the first-degree murder of Eastwood would be either life in

prison without parole or death. The trial court further apprised

Noetzel that, by pleading guilty, he would be waiving his

- 12 -

constitutional rights to remain silent, to a jury trial, and to confront witnesses, all of which Noetzel indicated he understood but wanted to waive and plead guilty. Noetzel confirmed that no one had promised him anything or threatened him in exchange for his plea; said that he was pleading guilty "[b]ecause I am guilty"; and further said that he did not require additional time to consider his strategy because he had already had "210 days to ponder" "the charges against [him] and any defenses that [he] might have."

Noetzel also confirmed that he had no objection to the factual basis offered by the State for the four offenses to which he sought to plead guilty; with respect to the first-degree murder of Eastwood, the factual basis was, "[T]he defendant was an inmate at Mayo Correctional Institute and did kill a fellow inmate by the name of Donald Eastwood by premeditated murder . . . in Lafayette County, Florida."

Before accepting Noetzel's plea, the trial court inquired as to whether there were any further suggested lines of inquiry. Noetzel's now-standby counsel responded, "Again, Your Honor, I would say this should all be done with the caveat that he hasn't been evaluated by an expert." The trial court stated, "That's what I plan

to do," accepted Noetzel's guilty plea, and also found Noetzel competent, ruling as follows:

> Mr. Noetzel, I'm going to accept your plea. I find it to be freely and voluntarily made. There are facts to support it. And it's all done with the cautionary issues that I've raised here with you regarding representing yourself and waiving your right to have an attorney present and represent you throughout the proceeding, and it's done knowingly, intelligently. I do find you to be at this point in time to be competent and intelligent and alert and the plea is accepted.

After accepting Noetzel's plea and finding him competent, the trial court explained that it was going "to have [Noetzel] evaluated to make sure that [he is] competent to proceed" and reiterated that this was being done "out of [an] abundance of caution."

### The Trial Court Orders a Competency Evaluation and the Expert Finds Noetzel Competent to Proceed

In accordance with its ruling at the January 21 motion hearing, the day after the trial court granted Noetzel's request for self-representation, accepted his guilty plea, and found him competent, it appointed Dr. Umesh M. Mhatre "to assess and evaluate [Noetzel] concerning his competency to stand trial and/or negotiate a disposition of his case." Consistent with the trial court's oral pronouncement that the evaluation was being ordered "out of

- 14 -

the abundance of caution because of the severity of the possible sentences here," not because of bona fide reason to doubt Noetzel's competency, the appointment order states that the evaluation was being ordered based on "concerns raised by the Court, the State, and the Defense concerning the gravity of [Noetzel's] decisions" to discharge counsel and waive his right to a jury trial.

Dr. Mhatre reviewed the arrest reports and Noetzel's records from the Department of Corrections (DOC), examined Noetzel on February 1, 2020, and found him competent to proceed. In addressing Noetzel's "Competency to Proceed," Dr. Mhatre's written report includes this finding: "The patient understands the nature of charges against him and has already pled guilty. He has released his attorney because he wants to represent himself in the sentencing phase." The "Medical and Psychiatric History" portions of the report indicate that Noetzel "did not know what medications he is currently receiving," that Noetzel "denies having any inpatient psychiatric care," but "has received outpatient treatment in the Department of Corrections," and that Noetzel "acknowledges having low moods, insomnia, and anhedonia" and "states that his prison lifestyle is what's making him depressed." The report notes that Dr.

Mhatre's review of Noetzel's DOC records revealed that Noetzel "has a past diagnosis of Bipolar Affective Disorder and was on Trileptal 300 mg twice a day and Effexor 150 mg a day."

Additionally, the "Mental Status Examination" portion of Dr. Mhatre's report includes these findings:

> During the interview, [Noetzel] was polite, respectful, and provided a lot of spontaneous information. He was quick to acknowledge his problems with his bad temper and impulsive behavior. He admits having a past history of depression because of his prison lifestyle, but the medications definitely seem[] to have helped.
> There was no evidence to auditory, visual, tactile, olfactory, or kinesthetic hallucinations. He is oriented to time, place, person. His memory is intact for immediate, recent, remote events. There were no signs of pressured speech, flight of ideas, or thought blocking.
> The patient is currently not suicidal or homicidal. His insight into his problem is adequate and his social judgment is significantly impaired.

Dr. Mhatre's report lists the following as his "Impression" of Noetzel's mental health: (1) major depressive disorder; (2) history of substance abuse; and (3) antisocial personality disorder. With respect to "Recommendations," the report states that Noetzel "acknowledges that the medications have helped him and he wants to stay on them as long as he needs to. He knows without the medications his condition could deteriorate."

## II. THE BENCH PENALTY-PHASE PROCEEDING

### The Trial Court Renews the Offer of Counsel and Renews the Competency Finding in Light of the Expert's Report

The bench penalty-phase proceeding, which subsumed the *Spencer*[4] hearing, occurred on February 21, 2020, and was a joint penalty phase with Noetzel's codefendant Bell, who had also exercised his right to self-representation, pleaded no contest, and, like Noetzel, had waived his right to a penalty-phase jury. Before commencing the penalty phase, the trial court renewed the offer of counsel, which Noetzel rejected.

Before accepting argument or evidence, the trial court again addressed the issue of Noetzel's competency to proceed. Specifically, the trial court stated that it had previously found Noetzel to be competent to proceed but "[o]ut of the abundance of caution," had ordered him "examined for competency" and had since received Dr. Mhatre's report. The trial court inquired as to whether Noetzel took "any exception to the Court considering [the] report . . . and [Dr. Mhatre's] determination that [Noetzel is]

---

4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

competent to represent [himself] or competent to proceed," and Noetzel responded that he "was happy with everything [Dr. Mhatre] said."

Based on the expert's evaluation, the trial court found that Noetzel was "*competent to proceed and there's no indication of any sort of mental infirmity or defect that would prevent [him] from doing so.*" (Emphasis added.) Noetzel indicated that he wanted to enter the competency evaluation as mitigation, and the trial court explained that Noetzel would have the ability to do that. After explaining the penalty-phase proceedings that were to follow, the trial court again renewed the offer of counsel, and Noetzel again indicated that he was certain he wanted to continue to represent himself.

**The Trial Court Conducts the Bench Penalty-Phase Proceeding**

Thereafter, the State proceeded with its opening statement, arguing that it intended to prove five aggravating circumstances in support of imposition of the death penalty: (1) prior violent felony based on the contemporaneous attempted murder of Officer Newman; (2) under sentence of imprisonment for a felony; (3) Eastwood's murder was committed to disrupt or hinder the lawful

exercise of any government function or the enforcement of laws because Eastwood's murder prevented him from completing his lawful sentence; (4) especially heinous, atrocious, or cruel (HAC); and (5) cold, calculated, and premeditated without any pretense of moral or legal justification (CCP). Neither Noetzel nor Bell presented an opening statement.

The State presented the testimony of five witnesses, namely two corrections officers, both of whom Noetzel cross-examined; two investigators to whom Noetzel had confessed; and the medical examiner who performed the victim's autopsy. The State also introduced numerous exhibits including, without objection, certified copies of Noetzel's judgments and sentences. During the State's case, Noetzel joined Bell in objecting to lines of questions related to Officer Newman, based on their joint argument, advanced by Bell, that evidence of their attempt to murder Officer Newman should not support the application of the prior violent felony aggravator.

After the State rested, Bell and Noetzel called only themselves as witnesses. Noetzel took responsibility for his actions and introduced his competency evaluation into evidence as mitigation. Noetzel also made the following statement in response to the trial

court's question as to whether he had "anything [he] want[ed] the Court to be aware of, any matters in mitigation?":

> The only thing that's for mitigation that we've already gone through that I've explained to you when you were asking about my competency and I answered all your questions.
> Everything is stated quite plainly. There's nothing more to say, you know.
> I have no regrets for anything I've done.
> Talking about my childhood or my family or any of those things, I don't think they have any bearing.
> Everything -- if you have a question, I'll answer it. I've got no problem with it.
> And I was quite, you know, happy to say I'm guilty for what I did.
> Other than that, I don't understand the mitigating part and other. You know, talking about regrets, problems in childhood, you know, those things are in the past, you know. People who use things, oh, I was beat up as a child. That's not a mitigating circumstance as far as I'm concerned, it's an excuse. You know, you did what you did. You knew what you were doing, right or wrong. We all know it.
> The State, I'm quite content with that and I think you for letting me talk.
> As I said, if y'all or anybody else has any questions, I'll answer them.

Following closing arguments, the trial court inquired as to whether there was anything further that should occur prior to the sentencing hearing, at which point the State asked the trial court to order a PSI for both Bell and Noetzel in light of the minimal mitigation presented. Over Bell's objection that a PSI was not

- 20 -

required because both he and Noetzel had presented some mitigation, the trial court exercised its discretion to "order one anyway."

Noetzel cooperated with the PSI, which contains a "Physical and Mental Health" section that denotes Noetzel's "health status" as "good" and includes the following remark: "The subject stated that he is in good physical health and does not have mental health issues. He does state that he was diagnosed with paranoid schizophrenia."

## III. THE FINAL PENALTY-PHASE HEARING

Before commencing the final penalty-phase hearing on March 13, 2020, the trial court renewed the offer of counsel, which Noetzel rejected. In renewing the offer of counsel, the trial court (1) reminded Noetzel of the "long litany of questions" it had gone through with him "regarding [his] decision to represent [himself]," (2) asked Noetzel whether he recalled those questions and his answers and whether he had any questions, and (3) inquired as to whether anyone had "threatened or forced" Noetzel to get him to reject counsel. Noetzel indicated that he understood his right to counsel and confirmed that he still wished to proceed without

counsel and that no one had threatened him in regard to his decision.

Next, the trial court asked Noetzel whether he had received a copy of the PSI and, if so, whether he had any "additions or corrections or points of clarification" to it. Noetzel confirmed that he had received a copy, agreed that the information in it was accurate, and stated that he did not have anything to add.

After hearing argument from the State regarding the four counts on which Noetzel was to be sentenced, the trial court inquired of Noetzel as to whether he had "any further matters in mitigation other than those that [he] presented in the penalty phase." Noetzel stated that he did not have additional mitigation to present and that he did not wish to address the court "as far as mitigation and recommendation . . . of the sentence."[5]

The trial court then proceeded to the sentencing portion of the hearing during which it adjudicated Noetzel guilty of each crime to which he had pleaded guilty and sentenced Noetzel to death for

---

5. This portion of the final hearing constituted additional proceedings in furtherance of the requirements of *Spencer*, 615 So. 2d at 690-91.

Eastwood's first-degree murder, to life for the attempted first-degree murder of Officer Newman with a weapon, to thirty years for conspiracy to commit first-degree murder of Officer Newman, and to fifteen years for possession of a weapon in prison, with all sentences to run concurrent with one another.

**The Sentencing Order**

The trial court's sentencing order reflects its rulings that Noetzel "knowingly and intelligently waived his right to counsel," and that Noetzel's "guilty plea was knowing, intelligent, and voluntary." The order also reflects that the trial court rejected one of the five statutory aggravating circumstances argued by the State, namely that the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws. However, the trial court found that the State had proven the existence of the other four aggravators it had argued beyond a reasonable doubt and assigned each the noted weight: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment (great weight); (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great

- 23 -

weight); (3) the capital felony was especially heinous, atrocious, or cruel (HAC) (very great weight); and (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (very great weight).

The trial court considered statutory mitigating circumstances but found that none had been established. However, it found the following three nonstatutory mitigating circumstances and assigned each the noted weight: (1) the defendant cooperated during the investigation of and prosecution for the killing of Mr. Eastwood (little weight); (2) the defendant exhibited appropriate courtroom behavior (little weight); and (3) the defendant was previously diagnosed with paranoid schizophrenia (little weight).

The trial court addressed Noetzel's previous diagnosis as follows:

> According to statements made by the Defendant during the preparation of the PSI, he had been diagnosed with paranoid schizophrenia. The Defendant did not mention any mental health issues during the penalty phase or present evidence to support it. Additionally, he reported being in "good physical health" and was found competent not only to proceed but also to waive counsel and represent himself.

*Court's Finding.* Therefore, given the Defendant's complete candor with this Court concerning his involvement in the crimes, this Court finds no reason to question or doubt this diagnosis. However, without more, a diagnosis of paranoid schizophrenia cannot justify or excuse the Defendant's conduct. Nonetheless, this Court assigns this mitigating circumstance little weight.

In sentencing Noetzel to death, the trial court further found "that the aggravating factors clearly, convincingly, and beyond a reasonable doubt outweigh the mitigating factors."

Noetzel now appeals.

## ANALYSIS

In this direct appeal, we address three issues. Noetzel briefed two issues in which he challenges—on several grounds related to his competency and the sufficiency of the trial court's *Faretta* inquiry—the trial court's rulings allowing him to waive counsel and represent himself. Noetzel's first issue centers on the trial court's handling of his statement during the *Faretta* inquiry that he had been prescribed a "psych med" for depression and chronic back pain that he was not taking "at this moment." Noetzel's second issue concerns the trial court's acceptance, as nonstatutory mitigation, of his self-disclosure, made during the PSI, that he had

- 25 -

been diagnosed with paranoid schizophrenia at an unspecified point in his past, before an expert found him competent to proceed and before the trial court found him competent. As the third issue, we conduct a mandatory review of Noetzel's guilty plea.

### (1) Competency and the Right to Self-Representation

Noetzel first argues that the trial court erred in granting his request for self-representation because it failed to adequately inquire into his mental-health status, including by ordering a competency evaluation, before allowing him to represent himself. He further claims that the trial court failed to "make[] a determination of record" that he "does not suffer from severe mental illness to the point where [he] is not competent to conduct trial proceedings by himself" within the meaning of Florida Rule of Criminal Procedure 3.111(d)(3).[6]

---

6. Noetzel also argues that the trial court failed to find that his counsel waiver was "intelligent." However, as the State correctly argues, the trial court made this finding in its sentencing order, ruling as follows: "[A] very lengthy and thorough *Faretta* inquiry was conducted pursuant to the Defendant's right and decision to represent himself. After it was determined that the Defendant knowingly and intelligently waived his right to counsel, he was permitted to represent himself."

We review a trial court's ruling on a request for self-representation for abuse of discretion, *Knight v. State*, 211 So. 3d 1, 15 (Fla. 2016), and where, as here, the errors alleged on appeal were not preserved, reversal is warranted only if the defendant establishes fundamental error, *see Hopkins v. State*, 632 So. 2d 1372, 1374 (Fla. 1994); *see also* § 924.051(3), Fla. Stat. (2020) ("A judgment or sentence may be reversed on appeal only when an appellate court determines after a review of the complete record that prejudicial error occurred and was properly preserved in the trial court or, if not properly preserved, would constitute fundamental error.").

Noetzel's arguments implicate three different standards. The first is the standard for competence to stand trial—i.e., whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (quoting Solicitor General's suggestion). The *Dusky* standard is the same standard of competence required to plead guilty or to waive the

- 27 -

right to assistance of counsel. *Godinez v. Moran*, 509 U.S. 389, 391, 398, 402 (1993).

The second is the *Faretta* standard for measuring whether a competent defendant's waiver of the right to counsel is knowing, voluntary, and intelligent. *See Faretta*, 422 U.S. at 835.

The third is the competency standard to conduct trial proceedings without assistance of counsel, which is "somewhat higher" than the *Dusky* competency standard. *Woodbury v. State*, 320 So. 3d 631, 646 (Fla. 2021) (citing *Wall v. State*, 238 So. 3d 127, 140 (Fla. 2018)). Specifically, the United States Supreme Court has held that states may "insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008); *see also* Fla. R. Crim. P. 3.111(d)(3) (implementing *Edwards*); *Wall*, 238 So. 3d at 140-41 ("Under *Edwards* . . . there is a heightened competency standard for actually representing oneself at trial; thus defendants may be competent to waive counsel yet incompetent to represent themselves.").

As explained below, the trial court did not abuse its discretion under any of these standards because (A) a competency hearing was not required; (B) competent, substantial evidence supports the trial court's findings that Noetzel's waiver of the right to counsel was knowing, voluntary, and intelligent under *Faretta*; and (C) the trial court was not required to find that Noetzel suffered from severe mental illness to the point that he was incompetent to conduct trial proceedings by himself.

**A. Competency**

Noetzel first argues that his disclosure during the *Faretta* inquiry that he had been prescribed a "psych med" for depression and chronic back pain that he was not taking "at this moment" should have resulted in further inquiry from the trial court. Specifically, he contends that the trial court should have ordered a competency evaluation and withheld its ruling on his request for self-representation pending the results. However, because a competency hearing was not required under the facts of Noetzel's case, the trial court did not abuse its discretion.

A criminal defendant has the right to not be proceeded against while mentally incompetent to stand trial, *Pate v. Robinson*, 383

U.S. 375, 378 (1966), and the requirement to inquire as to the defendant's competency is triggered as follows:

> If, at any material stage of a criminal proceeding, the court of its own motion, or on motion of counsel for the defendant or for the state, has reasonable ground to believe that the defendant is not mentally competent to proceed, the court shall immediately enter its order setting a time for a hearing to determine the defendant's mental condition . . . .

Fla. R. Crim. P. 3.210(b).

In *Godinez*, the Supreme Court explained that a trial court is "not . . . required to make a competency determination in every case in which a defendant seeks to plead guilty or to waive his right to counsel. As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence." 509 U.S. at 401 n.13 (citing *Drope v. Missouri*, 420 U.S. 162, 180-81 (1975); *Pate*, 383 U.S. at 385).

Moreover, in cases involving criminal defendants with histories of mental illness, this Court has recognized that "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Barnes v. State*, 124 So. 3d 904, 913 (Fla. 2013) (quoting *Card v. Singletary*, 981 F.2d 481, 487-

88 (11th Cir. 1992)); *see also Woodbury*, 320 So. 3d at 644 (rejecting Woodbury's claim that the trial court erred in failing to order a competency hearing where, "[l]ike the defendant in *Barnes*, Woodbury disclosed a history and diagnosis of bipolar disorder, but nothing about his behavior in court indicated a present inability to understand the proceedings against him or an inability to consult with his standby counsel (or with counsel, had an attorney been appointed)"); *Nelson v. State*, 43 So. 3d 20, 29 (Fla. 2010) (holding, in the context of rejecting a claim that trial counsel was ineffective for failing to move for a competency determination, that a "suicide attempt alone" does not raise a "presumption" of incompetency and that "the administration of Mellaril, a powerful antipsychotic drug, did not necessarily render [the defendant] incompetent").

Here, when the trial court questioned Noetzel regarding his mental health history during the *Faretta* inquiry, Noetzel disclosed that he had been prescribed a "psych med" for "depression" and "chronic back pain" and stated that he was not taking his prescribed medication "at this moment." The trial court inquired further, and Noetzel clarified that his medication does not positively or negatively affect his ability to understand, but rather, "just kind

of keeps [him] calm." Noetzel also confirmed that he was "fully capable" of understanding and comprehending "everything" that the trial court was discussing with him.

The trial court had the advantage of observing Noetzel in person and clearly did not witness anything that caused it to question Noetzel's competency. Further, a review of the record indicates nothing about Noetzel's behavior—at any point before or after the trial court granted his request for self-representation—that would arguably demonstrate a present inability to understand the proceedings against him or an inability to consult with standby counsel as required to trigger a competency hearing. *See* Fla. R. Crim. P. 3.210(b); *see also Barnes*, 124 So. 3d at 913.

Noetzel's case sits in stark comparison to a case such as *Drope*, 420 U.S. at 179, where the trial court ignored instances that raised a bona fide doubt as to the defendant's competency, including that the defendant had attempted suicide during the trial and had engaged in "pronounced irrational behavior" between the time of the crime and the trial. There was no such behavior in Noetzel's case. To the contrary, Noetzel filed several pro se motions, which he followed up with a pro se letter. During all four of the

court proceedings—(1) the first appearance and arraignment, (2) the motion hearing, (3) the bench penalty-phase proceeding, and (4) the final penalty-phase hearing—Noetzel demonstrated that he understood the legal issues; he articulated his strategy; he engaged with the trial court's questioning; and his courtroom behavior was appropriate.

Moreover, the trial court ultimately did order a competency evaluation even though one was not necessary under the *Pate* standard codified in rule 3.210(b). Specifically, after inquiring of then-appointed defense counsel, who stated that he had "not seen any reason personally to doubt that Mr. Noetzel is competent to make the decision to represent himself," the trial court stated that it did not "see any reason to believe in any way that [Noetzel was] incompetent to proceed." Nevertheless, despite finding Noetzel competent, the trial court ordered a competency evaluation "out of the abundance of caution because of the severity of the possible sentences here." Thereafter, the expert found Noetzel competent to proceed, and the trial court subsequently renewed its competency finding based on the expert's report.

Under these facts, the trial court did not abuse its discretion.

## B. Self-Representation

A competent criminal defendant has a Sixth Amendment right to represent himself at trial. *Tennis v. State*, 997 So. 2d 375, 377-78 (Fla. 2008). A defendant's unequivocal request for self-representation triggers the trial court's obligation to hold a *Faretta* inquiry, the purpose of which is to determine whether the waiver of the Sixth Amendment right to counsel is knowing, voluntary, and intelligent. *Tennis*, 997 So. 2d at 378. Unlike the competency inquiry discussed above, which focuses on "the defendant's mental capacity," i.e., "whether he has the *ability* to understand the proceedings," the "purpose of the 'knowing and voluntary' inquiry" under *Faretta* "is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez*, 509 U.S. at 401 n.12.

Regarding the "proper scope" of the *Faretta* inquiry, this Court recently reiterated "that once a court determines that a competent defendant of his or own free will has 'knowingly and intelligently' waived the right to counsel, the dictates of *Faretta* are satisfied, the inquiry is over, and the defendant may proceed unrepresented."

*Hooks v. State*, 286 So. 3d 163, 168 (Fla. 2019) (quoting *State v. Bowen*, 698 So. 2d 248, 251 (Fla. 1997)). In other words, "there are no 'magic words' under *Faretta*." *Id.* (quoting *Potts v. State*, 718 So. 2d 757, 760 (Fla. 1998)). Rather, "[t]he accused must only 'be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id.* at 167 (quoting *Faretta*, 422 U.S. at 835). On review, the appellate court "will evaluate 'the defendant's general understanding of his or her rights.' " *Id.* at 168 (quoting *Potts*, 718 So. 2d at 760).

In Noetzel's case, the trial court conducted a lengthy *Faretta* inquiry, during which it explained the dangers and disadvantages of self-representation and the advantages of being represented by counsel. Noetzel now faults the trial court for not inquiring further into his mental health status, but the record shows that during the *Faretta* inquiry, the trial court continued to question Noetzel until it was satisfied that neither mental illness nor Noetzel's not taking his prescribed medication "at this moment" prevented Noetzel from understanding the rights being discussed.

Further, there is no indication in the record that Noetzel failed to understand his rights or that he was not exercising his right to self-representation with his eyes open. To the contrary, Noetzel admitted that he understood it was completely inadvisable to represent himself but explained that he wanted to do so to further his strategy to quickly plead guilty because he was guilty and to "streamline" the sentencing phase of the proceeding as much as possible.[7] Noetzel's disclosure of a mental illness does not preclude him from waiving the right to counsel and proceeding pro se. *Cf. Woodbury*, 320 So. 3d at 647-48 ("Given that certain people with bipolar disorder function well and act rationally, we see no logic in

---

7. When the trial court questioned Noetzel as to why he wanted to waive a penalty-phase jury, Noetzel explained his strategy, in part, as follows:

> Why mess somebody else's life up? I've already said I'm guilty. Every investigator that I've sat in front of, I've walked them through step by step how I killed [Eastwood] and the reasons that I wanted to kill that officer. Plain and simple, walked them step by step. I have not wavered from what I've done.
> There's no sense in bringing a jury involved and messing up their lives, having to spend money to pay people to come in her and uproot their lives when I can just sit here with you and we can streamline this and be done with it.

creating a per se rule or presumption that all individuals with bipolar disorder suffer so severely from mental illness that they are unable to carry out basic trial tasks without assistance.").

Because competent, substantial evidence supports the trial court's finding that Noetzel's waiver of the right to counsel was knowing, voluntary, and intelligent under *Faretta*, the trial court did not abuse its discretion in granting Noetzel's request for self-representation.

### C. Rule 3.111(d)(3)

Noetzel also argues that the trial court erred under the "somewhat higher" competency standard of rule 3.111(d)(3). *Woodbury*, 320 So. 3d at 646. We disagree.

Although the technical skill of a criminal defendant to represent himself is not part of the *Faretta* inquiry, "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Edwards*, 554 U.S. at 177 (quoting *Martinez v. Court of Appeal*, 528 U.S. 152, 162 (2000)). Thus, the Supreme Court held in *Edwards* that "the Constitution permits States to insist upon representation by counsel for those competent enough to

stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178.

Following *Edwards*, this Court amended Florida Rule of Criminal Procedure 3.111(d)(3) to "implement the narrow limitation upon the right to self-representation recognized in *Edwards*," but did so "[w]ithout deciding whether *Edwards* compels states to provide additional protection to severely mentally ill defendants." *In re Amends. to Fla. Rule of Crim. Proc. 3.111*, 17 So. 3d 272, 274 (Fla. 2009). Rule 3.111(d)(3) thus authorizes trial courts to force counsel upon a competent criminal defendant who has waived the right to counsel and seeks to represent himself at trial in the limited instance where the defendant "suffer[s] from severe mental illness to the point where [he] is not competent to conduct trial proceedings by himself."

As an initial matter, the parties disagree as to whether rule 3.111(d)(3) applies to a case like Noetzel's—where the defendant pleads guilty rather than proceed to trial but represents himself, with standby counsel, during the penalty phase. However, we need not resolve the open question of whether what happened in

Noetzel's case amounts to a defendant "conduct[ing] trial proceedings by himself," within the meaning of rule 3.111(d). That is because, even if the rule applies to Noetzel's case, our precedent clearly establishes that the trial court did not abuse its discretion by *not* forcing counsel upon Noetzel under the rule.

In *Woodbury*, 320 So. 3d at 647-48, after reviewing the record, we rejected the defendant's argument that his "purportedly erratic," *id.* at 648, "behavior in court, together with his bipolar diagnosis, required the trial court to find that [he] suffered from severe mental illness to the point of being incompetent to conduct the proceedings by himself," *id.* at 647. Under *Woodbury*, Noetzel's case is not even close, as there is no "purportedly erratic" behavior. Indeed, there is nothing in the record to indicate that Noetzel's mental illness manifested in a way that would have precluded him from conducting trial proceedings by himself within the meaning of rule 3.111(d)(3). To the contrary, the record shows that Noetzel filed various pro se motions, including a motion to compel a ruling on his request for self-representation, and addressed them with the trial court. During the bench penalty-phase proceeding, Noetzel cross-examined witnesses, objected to one of the State's exhibits,

introduced his competency evaluation into evidence, and made a statement to the court that aligned with his previously explained strategies of pleading guilty because he was guilty and of streamlining the penalty-phase proceedings as much as possible. During all of the proceedings, Noetzel's interactions with the trial court were appropriate; he had no trouble following what was happening or carrying out his previously articulated strategies. Moreover, before proceeding with the bench penalty phase, the trial court did, in fact, rule that Noetzel was "*competent to proceed and there's no indication of any sort of mental infirmity or defect that would prevent [him] from doing so.*"  (Emphasis added.)  Competent, substantial evidence supports that finding.[8]

---

8.  Noetzel faults the trial court for limiting the competency evaluation that it ordered in an "abundance of caution" to his competency to proceed—as opposed to also ordering evaluation of whether he suffers from severe mental illness to the point he is not competent to conduct trial proceedings by himself within the meaning of rule 3.111(d)(3).  However, the Florida Statutes and this Court's procedural rules governing the appointment of experts to evaluate competency address mental competence to proceed and require experts to detail specific findings regarding the defendant's mental capacity—findings that were made by the expert in this case.  *See* § 916.12, Fla. Stat. (2020); Fla R. Crim. P. 3.211-3.212.  These provisions do not require additional findings from appointed experts regarding the "somewhat higher" "competency standard to

Accordingly, even assuming that rule 3.111(d)(3) applies, the trial court did not abuse its discretion by failing to find that Noetzel suffered from severe mental illness to the point of being incompetent to conduct the penalty-phase proceedings by himself.

### (2) Noetzel's Disclosure During the PSI

In his second issue, Noetzel argues that even if the trial court did not initially err by granting his request for self-representation, it erred by continuing to allow him to represent himself at the final penalty-phase hearing that occurred on March 13, 2020, following the PSI. More specifically, Noetzel claims that because the trial court accepted, as nonstatutory mitigation, his self-disclosure during the PSI that he had been diagnosed with paranoid schizophrenia at an unspecified point in his past, the trial court was required to conduct a new *Faretta* inquiry and revisit the issue of competency before accepting Noetzel's rejection of the renewed offer of counsel. These arguments were not preserved below, and we hold that Noetzel has failed to establish an abuse of discretion by the trial court, let alone fundamental error.

---

conduct trial proceedings without assistance." *Woodbury*, 320 So. 3d at 646.

First, with respect to competency, the self-disclosure pertained to a diagnosis that occurred at some unspecified point in Noetzel's past, but *before* the trial court's interactions with Noetzel, *before* the expert evaluated Noetzel and found him competent to proceed, and *before* the trial court's competency findings. The trial court's subsequent acceptance of mitigation in the form of a past diagnosis does not change the competency calculus because mitigation pertains to "factors in the defendant's *background* that would mitigate against imposition of the death penalty," § 921.141(7)(h), Fla. Stat. (2020) (emphasis added), whereas competency pertains to *present* ability, *see Dusky*, 362 U.S. at 402. And, again, as addressed under issue 1, there are no manifestations of mental illness or other behavior anywhere in the record that give rise to a bona fide doubt as to Noetzel's competence—either to stand trial or, assuming rule 3.111(d)(3) applies, to conduct trial proceedings by himself. *See Dessaure v. State*, 55 So. 3d 478, 482-83 (Fla. 2010) ("Once a defendant has been deemed competent, the presumption of competence continues throughout all subsequent proceedings. A subsequent competency hearing is only required 'if a bona fide question as to the defendant's competency has been raised.' ")

(citation omitted) (quoting *Boyd v. State*, 910 So. 2d 167, 187 (Fla. 2005)).

Second, the trial court's crediting of Noetzel's self-disclosure as mitigation did not mandate a new *Faretta* inquiry before the trial court could properly accept Noetzel's rejection of the renewed offer of counsel at the beginning of the final penalty-phase hearing. Our precedent requires that the trial court renew the offer of counsel at each subsequent crucial stage of the proceeding. *See Traylor v. State*, 596 So. 2d 957, 968 (Fla. 1992) (explaining that, under the Florida Constitution, "the defendant is entitled to decide at each crucial stage of the proceedings whether he or she requires the assistance of counsel" and that "the waiver [of counsel] applies only to the present stage and must be renewed at each subsequent crucial stage where the defendant is unrepresented"); *see also* Fla. R. Crim. P. 3.111(d)(5) ("If a waiver is accepted at any stage of the proceedings, the offer of assistance of counsel shall be renewed by the court at each subsequent stage of the proceedings at which the defendant appears without counsel.").

However, absent a substantial change in circumstances that would cause the trial court to question its original ruling on the

defendant's request for self-representation, there is no concomitant requirement to revisit *Faretta* every time the offer of counsel is subsequently renewed and rejected. *See Woodbury*, 320 So. 3d at 647 n.7 ("We do not suggest that all of these [renewed] offers [of counsel] and *Faretta* inquiries were legally required. The record indicates that the trial court conducted so many inquiries to ensure that the offer of counsel was renewed at all critical stages of the proceedings. Nothing in the record suggests that any of the inquiries were prompted by new concerns about [the defendant's] behavior or competency."); *see also United States v. Nunez,* 137 F. App'x 214, 215 (11th Cir. 2005) ("If we were to place upon the district court an obligation to reassess its *Faretta* hearing decision, we would do so only on a showing of a substantial change in circumstances since the initial hearing.").[9]

In this case, when Noetzel rejected the renewed offer of counsel at the final penalty-phase hearing, there had been no

9. To the extent the First District Court of Appeal held to the contrary in *Howard v. State,* 147 So. 3d 1040, 1043 (Fla. 1st DCA 2014), when it stated (emphasis ours) that "[f]ailure to renew the offer of counsel at a critical stage *and conduct a* Faretta *inquiry if the defendant rejects the renewed offer* is per se reversible error," we disapprove *Howard.*

change of circumstances that should have caused the trial court to question its finding from the January 21, 2020, motion hearing that Noetzel knowingly, intelligently, and voluntary exercised his right to self-representation under *Faretta*. Moreover, even though it would not have been an abuse of discretion for the trial court to have accepted Noetzel's representation that he wanted to continue pro se, the trial court actually did revisit *Faretta*, at least in part, before permitting Noetzel to do so by (1) reminding Noetzel of the "long litany of questions" it had gone through with him "regarding [his] decision to represent [himself]," (2) asking Noetzel whether he recalled those questions and his answers and whether he had any questions, and (3) inquiring as to whether anyone had "threatened or forced" Noetzel to get him to reject counsel. Noetzel indicated that he understood his right to counsel and confirmed that he still wished to proceed without counsel and that no one had threatened him in regard to his decision.

In our view, the trial court did everything right. It certainly did not fundamentally err.

## (3) Guilty Plea

Because we have rejected Noetzel's argument that the trial court erred by finding him competent to waive counsel and because the competency standards for waiving the right to counsel, pleading guilty, and standing trial are all the same *Dusky* standard, it follows that Noetzel was *competent* to plead guilty immediately after his counsel waiver. *See Godinez,* 509 U.S. at 391, 398, 402.

However, where the defendant's guilty plea results in a sentence of death, our mandatory obligation to review whether sufficient evidence supports the first-degree murder conviction, *see* Fla. R. App. P. 9.142(a)(5), requires a review of the guilty plea, under the following standard:

> "[W]hen a defendant has pled guilty to the charges resulting in a penalty of death, this Court's review shifts to the knowing, intelligent, and voluntary nature of that plea." *Winkles v. State*, 894 So. 2d 842, 847 (Fla. 2005) (quoting *Lynch v. State*, 841 So. 2d 362, 375 (Fla. 2003)). Thus, . . . the Court must "scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily." *Id.* (quoting *Ocha [v. State]*, 826 So. 2d [956,] 965 [(Fla. 2002)]).

*Doty v. State*, 170 So. 3d 731, 738 (Fla. 2015). In addition, the *Doty* Court looked to "[t]he factual basis for the plea" to determine that

there was "competent, substantial evidence to support the conviction for first-degree murder."  170 So. 3d at 739.

Noetzel's plea satisfies the *Doty* standard.  The trial court advised Noetzel of the constitutional rights that he would be waiving by pleading guilty, and Noetzel indicated that he understood.  *See Godinez*, 509 U.S. at 397 n.7 ("A criminal defendant waives three constitutional rights when he pleads guilty: the privilege against self-incrimination, the right to a jury trial, and the right to confront one's accusers.") (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)).  The trial court also reviewed the two possible sentences that could result from a guilty plea, namely life in prison without the possibility of parole or death, and Noetzel confirmed that he understood.  Additionally, the trial court inquired into the voluntariness of Noetzel's plea, and Noetzel stated that no one had promised him anything or threatened him in exchange for the plea.  To the contrary, Noetzel said that he was pleading guilty "[b]ecause I am guilty."  Finally, the factual basis the State provided for the plea, to which Noetzel stated he had no objection, is competent, substantial evidence to support Noetzel's conviction for first-degree murder.  *See Doty*, 170 So. 3d at 739.

## CONCLUSION

For the foregoing reasons, we affirm Noetzel's first-degree murder conviction and sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

For the reasons expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (receding from proportionality review requirement in death penalty direct appeal cases), I can only concur in the result.

An Appeal from the Circuit Court in and for Lafayette County,
    David W. Fina, Judge – Case No. 342019CF000055CFAXMX

Baya Harrison, III, Monticello, Florida,

    for Appellant

Ashley Moody, Attorney General, Jason W. Rodriguez and Michael T. Kennett, Assistant Attorneys General, Tallahassee, Florida,

    for Appellee