# Supreme Court of Florida

---

No. SC2021-1001

---

**WILLIAM E. WELLS III,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

April 13, 2023

GROSSHANS, J.

William E. Wells III appeals his judgment of conviction of first-degree murder and sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons given below, we affirm in all respects.

## BACKGROUND

On July 5, 2019, Wells, aided by Leo Boatman, murdered fellow prison inmate, William Chapman. At the time, Wells was

serving seven consecutive life sentences—six for first-degree murder and one for attempted premeditated murder.[1]

At least a month before Chapman's death, Wells and Boatman began planning the murder. As Wells would later explain, he hoped to receive the death penalty and be placed on death row where he anticipated better living conditions.

With this goal in mind, Wells decided to target Chapman, believing that Chapman intended to recruit him for sexual favors. In preparation for the murder, Wells and Boatman collected two ten-inch-long metal shanks, sharpened them over the course of several days, and ultimately hid them near the dayroom. Wells also crafted ligatures from his bed sheet and pillowcase to be used during the attack.

On the day of the murder, Wells packed his belongings so that authorities could easily collect them. Later, Wells, Boatman,

---

1. In 2003, Wells murdered his wife, her father, her brother, and two other males in Mayport, Florida. After killing them, Wells remained in his trailer for two weeks with the "rotting bodies." He pled guilty to these murders and received life sentences. Eight years later, while serving those sentences (and another life sentence for attempted murder), Wells brutally murdered a fellow inmate using a shank and ligatures. A jury found him guilty of first-degree murder but ultimately recommended a life sentence.

Chapman, and several other inmates were ushered into the dayroom, which was equipped with a surveillance camera. About ten minutes before the attack, Boatman left the dayroom to walk to the bathroom and, upon his return, Wells did the same. Once Wells returned, Boatman approached Chapman, spoke to him, and the two walked to an area of the room in the camera's blind spot. Wells removed a ligature—which had been concealed in his clothing—and walked toward them.

Upon joining Boatman and Chapman, Wells wrapped the ligature around Chapman's neck and began choking him. As Chapman struggled to break free, Boatman started punching him. Anticipating that corrections officers would soon try to intervene, Boatman moved in front of the only door to the dayroom, blocked it with his foot, and brandished the two shanks. When corrections officers pushed on the door, Boatman shouted that he would kill them if they entered.

While Boatman was blocking the door, Wells dragged Chapman over to him. Struggling to breathe, Chapman pled for his life, begging: "Please don't kill me." Disregarding Chapman's pleas, Wells and Boatman continued the assault.

Boatman began stabbing Chapman in the eyes with the shanks. Eventually, the responding corrections officers pushed the door open enough to deploy a chemical agent into the dayroom. But the chemical agent had no effect on Wells or Boatman. At some point when the door was slightly ajar, Chapman managed to get his fingers in the gap between the door and the frame. But even with Chapman's efforts, the officers could not open the door.

As the brutal attack continued, Boatman handed Wells a shank, which Wells used to forcefully stab Chapman in his back. By this time, Chapman was offering no resistance and lying face down on the floor. Sensing that Chapman was still breathing, Wells urged Boatman to keep stabbing him. To buy them more time and prevent corrections officers from entering the dayroom, Wells tied the door handle to the nearest bench—which was bolted to the floor. With the door secured in this way, Wells and Boatman continued beating and stabbing Chapman without intervention. Toward the end of the twelve-minute assault, Boatman plunged a shank into Chapman's neck and stomped on it, doing so with such force that the shank went completely through Chapman's neck and bent under the pressure of being driven into the floor.

Eventually, Wells and Boatman ceased their attack and allowed a tactical team and corrections officers to enter the room. The officers apprehended Wells and Boatman and removed Chapman, still breathing, from the dayroom. Despite receiving medical care, Chapman died shortly after the attack due to the extensive injuries inflicted by Wells and Boatman.

Meanwhile, shortly after law enforcement apprehended Wells, he made several unsolicited statements. Referring to his "last murder," Wells criticized the jury for sparing his life by "not giving [him] the death sentence." Wells also joked about using Chapman's body "as a doorstop" to prevent the officers from intervening. While still discussing the attack, Wells bragged about how deep he inserted the shank into Chapman's body. Wells also acknowledged that he had, in fact, made plans to murder Chapman.

The day after the murder, law enforcement agents conducted a recorded interview of Wells. After the agents advised Wells of his *Miranda*[2] rights, he made multiple incriminating statements—giving

---

2. *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 5 -

the reasons he selected the victim and disclosing his plans and preparations for carrying out the murder.

Ultimately, the State indicted Wells on charges of premeditated first-degree murder and possession of a weapon by a state prisoner. Based on the charge of first-degree murder, the State filed a notice of intent to seek the death penalty.

The day after the indictment, Wells filed a motion requesting to represent himself and another motion asking to waive a penalty-phase jury. Before ruling on these motions, the trial court appointed Dr. Harry Krop to perform a competency evaluation on Wells. After conducting that evaluation, Dr. Krop found that Wells was competent to stand trial.

At the arraignment, the court addressed Wells's motion to represent himself. The court underscored the benefits of using appointed counsel over proceeding pro se and also noted pitfalls associated with self-representation. Wells acknowledged the court's concerns but maintained that he wished to represent himself. The court then conducted a thorough *Faretta*[3] inquiry, and upon

---

3. *Faretta v. California*, 422 U.S. 806 (1975).

completion, granted Wells's motion for self-representation. At that same hearing, the court appointed regional counsel to function as Wells's standby counsel and accepted his plea to the weapons possession charge.

Wells, however, soon changed his mind and requested representation. The court granted that request. Then, two months later, Wells again decided to proceed pro se and requested that regional counsel be discharged. Following another *Faretta* inquiry, the court granted Wells's request.

After the *Faretta* inquiry, Wells informed the court that he wanted to plead guilty to the first-degree murder charge. After a lengthy colloquy with Wells and the prosecutor's presentation of a factual basis, the court accepted the guilty plea, finding it to be knowingly, freely, voluntarily, and intelligently given. Then, as he had done before, Wells expressed his intent to waive a penalty-phase jury and not present mitigating evidence during the bench penalty phase. Notwithstanding Wells's decision on mitigation, the court ordered that the mitigating evidence from Wells's prior capital case be made available. According to the court, its intent was to

review and take notice of that mitigating evidence during the forthcoming penalty phase.

Several months later, while Wells was still representing himself, standby counsel moved to continue. Standby counsel asserted that they had not had an opportunity to undertake the necessary preparations should they be reappointed. Standby counsel did not claim that the motion was filed at Wells's direction or with his consent. The court denied the motion without prejudice.

Ultimately, the penalty phase began nine months after the charges were filed. At the outset, Wells reiterated that he did not want counsel appointed or a jury impaneled. And he again stated that he would not present any mitigating evidence.

During the State's case, it introduced several exhibits, including: (1) surveillance videos of Chapman's murder, (2) a video of Wells's initial comments, (3) a recording of Wells's interview with law enforcement agents, and (4) the medical examiner's report showing Chapman's manner and cause of death.[4]

---

4. Consistent with Wells's stipulation, the court took judicial notice of the judgments and sentences for Wells's six prior murders.

The State also called four witnesses. One witness, a special agent, testified about interviewing Wells after the murder. The agent explained that, after receiving the *Miranda* warning, Wells discussed his plans to commit the murder, emphasizing that preparations were made days in advance. According to Wells, those advanced preparations showed that the murder was clearly "cold, calculated, and premeditated." For its final witness, the State called Dr. William Hamilton, the medical examiner who autopsied Chapman.

Just prior to Dr. Hamilton taking the stand, Wells requested the appointment of regional counsel. The court granted that request. Given the sudden change of circumstances, counsel immediately moved for a continuance. The court granted the motion but allowed the State to proceed with Dr. Hamilton's examination before continuing the penalty phase. The court gave regional counsel the option to cross-examine Dr. Hamilton that day, but noted that counsel would be permitted to again cross-examine the witness when the penalty phase resumed. The court also notified regional counsel that the mitigation specialist who

investigated and prepared mitigating evidence for Wells's prior death-penalty case was available.

Seven months later, regional counsel moved to continue, requesting more time to prepare. The trial court denied the request. Five days before the penalty phase was scheduled to resume, defense counsel filed another motion to continue, which the court also denied.

The penalty phase ultimately resumed over eight months after the State completed its case. At the resumed penalty phase, the defense presented mitigating evidence over the course of three days. In total, the defense offered eight witnesses, including four experts.

Dr. Jeffrey Danziger, a forensic psychiatrist, was the first expert witness. Based on his review of extensive records and an interview with Wells, Dr. Danziger opined that Wells suffered from serious psychiatric and mental health issues, significant brain injury, schizoaffective disorder, post-traumatic stress disorder (PTSD), cognitive deficits and limitations, and multiple adverse childhood experiences.

Dr. Heather Holmes, a clinical and forensic psychologist, evaluated Wells in connection with the prior death-penalty case,

met with him twice in the instant case, and reviewed extensive records. Dr. Holmes testified to the traumatic effects of Wells's childhood experiences, including an abusive alcoholic father who gave Wells alcohol at age four, shot him in the foot as a punishment, and forced him to have sex with a prostitute on his thirteenth birthday. Dr. Holmes added that Wells also suffered traumatic experiences as an adult. These adult traumatic experiences included the death of a stepchild and a suicide attempt following the shooting of his second wife.

Dr. Joseph Wu, a psychiatrist and expert in neuroimaging and forensic psychiatry, also testified for the defense. He reviewed records and Wells's neuroimaging scans. Based on his experience and training, Dr. Wu opined that Wells's scans showed brain abnormalities consistent with traumatic brain injury, schizophrenia, or bipolar disorder, which can result in difficulty regulating impulses. Dr. Wu also noted that Wells's worsening condition was consistent with chronic traumatic encephalopathy (CTE). According to Dr. Wu, Wells suffered at least nine traumatic brain injuries that could contribute to CTE. Dr. Wu ultimately concluded that Wells suffered from traumatic brain injury, fetal

- 11 -

alcohol spectrum disorder, childhood neglect and abuse, psychosis or schizophrenia, mood disorder, and was at high risk for CTE.

Dr. Terry Kupers, a psychiatrist, was the final expert witness. Dr. Kupers testified about the negative effects of solitary confinement and close management levels, especially on the mentally ill. He opined that it was impossible to provide adequate mental health treatment in these conditions, and that this accelerated the deterioration of Wells's mental health. Dr. Kupers further opined that, in his view, Wells was under the influence of extreme mental or emotional disturbance when he murdered Chapman, and that his capacity to appreciate the criminality of his conduct or conform to the requirements of law was substantially impaired at that time.

Four lay witnesses testified to different aspects of Wells's life. The first witness, Johnny Hodges, was an inmate. Hodges testified that Wells was upset with the ineffectiveness of the prison psychiatric staff. Another witness, Gwendolyn Lockwood, a prison therapist and Wells's case manager, described the difficulties in providing adequate mental health treatment in prison. Lockwood recounted observing Wells's mental decline leading up to the

murder, including hallucinations, anxiety, agitation, and flashbacks. She reported her concerns to the medical director who, to her knowledge, never visited Wells. The other two witnesses described Wells as a likeable individual, who had been devastated by personal loss.

Following the penalty phase, the State and Wells filed sentencing memoranda. In arguing for the death penalty, the State relied on four statutory aggravating factors, contending that they outweighed any established mitigating circumstances. For his part, Wells asked the court to find 96 mitigators, including some specified in Florida's death-penalty statute, *see* § 921.141(7), Fla. Stat. (2021) (listing seven specific mitigators and one catchall provision). As for two statutory factors, Wells claimed that he committed the murder while under an extreme emotion or mental disturbance and that, when he murdered Chapman, his "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired."

After receiving the sentencing memoranda, the court held a consolidated *Spencer*[5] and sentencing hearing. No additional evidence was presented other than Wells's own statements made under oath. Based on the evidence presented at the penalty phase, the court found four aggravating factors proven beyond a reasonable doubt: Wells committed the capital felony after previously being convicted of a felony and under the sentence of imprisonment (great weight); Wells was previously convicted of another capital felony or a felony involving the use or threat of violence (very great weight); the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and Wells committed the murder in a cold, calculated, and premeditated manner (CCP) (great weight).

Turning to mitigation, the trial court found that Wells failed to prove any statutory ground. According to the court, while Wells suffered from significant mental health and emotional issues, he did not "reasonably establish that he was acting under the influence of an extreme mental or emotional disturbance when he committed

---

5. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 14 -

the crime." The court emphasized that Wells's actions were controlled and carried out deliberately to accomplish the goal of improving his living conditions by being placed on death row. The court further found that there was no credible evidence that Wells's ability to conform his conduct to the law was substantially impaired or that he did not know that killing the victim was wrong; nor was there any evidence that Wells was not thinking clearly before, during, or immediately after the murder.

Though rejecting the statutory mitigators, the court found several nonstatutory mitigating circumstances to be supported by the evidence: Wells experienced extreme childhood abuse, neglect, and other traumatic events in his early adulthood (slight weight); Wells suffered from serious mental illness, neurocognitive issues, and was in solitary confinement or close management for thirteen years (some weight); Wells cooperated with authorities after the incident (slight weight); Wells took responsibility for the offense (slight weight); Wells respected FDOC staff and the court throughout the proceedings (some weight); Wells struggled with substance abuse and alcoholism throughout his life (slight weight);

Wells's mental health needs were neglected by FDOC (slight weight); and Wells showed remorse for the murder (slight weight).

Ultimately, the court concluded that the aggravating circumstances far outweighed the mitigating circumstances, warranting a sentence of death. Wells now appeals.

## ANALYSIS

Wells raises five issues for our review. At the outset, he challenges the trial court's refusal to grant him additional preparation time for the penalty phase. He next argues that the trial court abused its discretion in rejecting two statutory mitigating circumstances. Additionally, he claims fundamental error in the court's failure to make certain findings in the sentencing order. He concludes by raising two constitutional challenges to his death sentence. And though not raised by Wells, we must also determine whether his guilty plea was knowingly, intelligently, and voluntarily made.

### Motion to Continue

After the State charged Wells with first-degree murder, he chose to proceed pro se. He, however, changed his mind two months later, and the trial court appointed regional counsel

pursuant to his request. Almost three months later, Wells again changed course and dismissed regional counsel, noting that he did not wish to present any mitigating evidence. At that time, the trial court designated regional counsel to function as standby counsel. Wells then pled guilty and proceeded pro se until the second day of the penalty phase—just before the State completed presentation of aggravating evidence. Stating unspecified family reasons, Wells asked for regional counsel to again fully represent him. The court granted that request and gave the defense a continuance. Roughly eight months later, as the scheduled date for resuming the penalty phase neared, regional counsel asked for a continuance on multiple occasions. The court denied those requests. According to Wells, the refusal to grant a continuance was an abuse of discretion. We disagree.

We review the denial of a motion to continue for an abuse of discretion. *Carr v. State*, 156 So. 3d 1052, 1064 (Fla. 2015). Under this "highly deferential" standard, *In re Doe*, 325 So. 3d 99, 100 (Fla. 5th DCA 2019), we will uphold a trial court's ruling unless it "is arbitrary, fanciful, or unreasonable." *Trease v. State*, 768 So. 2d 1050, 1053 n.2 (Fla. 2000) (quoting *Huff v. State*, 569 So. 2d 1247,

1249 (Fla. 1990)). Put differently, we will not find an abuse of discretion unless the trial court makes a ruling which no reasonable judge would agree with. *See Kelley v. State*, 974 So. 2d 1047, 1051 (Fla. 2007). Here, Wells cannot show that the trial court's decision—to deny a continuance before the resumption of the penalty phase—meets this standard.

Here, counsel had more than eight months after their reappointment to focus on the mitigation component of the penalty phase.[6] In developing mitigating evidence, counsel did not start from scratch. Instead, counsel had the benefit of mitigating evidence presented in 2017 in Wells's prior death-penalty case— mitigating evidence that resulted in a jury recommendation of life in prison. Also, counsel had the assistance of a mitigation specialist who was already familiar with Wells and his background—having, in fact, conducted the investigation which led to much of the mitigation at the prior penalty phase. With the benefit of these leads, counsel presented a significant amount of mitigating evidence

---

6. Wells does not argue that the trial court committed error by not reopening the State's case so that defense counsel could have the opportunity to cross-examine all of the State's witnesses.

- 18 -

at the penalty phase. Indeed, crediting substantial portions of that evidence, the trial court found eight nonstatutory mitigating circumstances. Accordingly, based on the amount of time the defense had to prepare a mitigation case and the availability of strong leads, we hold that the trial court did not abuse its discretion in declining to grant an undefined additional period of time to prepare.[7]

## Mitigating Evidence

Wells next argues that the trial court erred in rejecting two statutory mitigating circumstances. Concluding that the record supports the court's findings as to these mitigators, we reject Wells's argument.

Under our case law, a trial court has the authority to reject a mitigator outright when the State presents evidence incompatible with it. *Colley v. State*, 310 So. 3d 2, 16 (Fla. 2020). For example, we have said, "A mitigator may . . . be rejected if the testimony

---

7. Consistent with a finding made by the trial court, we note that Wells's own decisions regarding counsel adversely affected the time regional counsel had to prepare. *See McKay v. State*, 504 So. 2d 1280, 1282 (Fla. 1st DCA 1986) (recognizing defendant's own conduct in shortening preparation time as factor in determining whether court abused its discretion in denying continuance).

supporting it is not substantiated by the actions of the defendant, or if the testimony supporting it conflicts with other evidence." *Bright v. State*, 299 So. 3d 985, 1005 (Fla. 2020) (alteration in original) (quoting *Oyola v. State*, 99 So. 3d 431, 445 (Fla. 2012)). This principle applies even when the defense presents expert evidence supporting a mitigator—and even if the State does not counter that evidence with an expert of its own. *Id.* at 1005.

Here, competent, substantial evidence supports the court's rejection of the extreme-disturbance and substantial-impairment mitigators. As to the extreme-disturbance mitigator, the surveillance video shows Wells engaging in calm, deliberate conduct during the vicious attack while methodically carrying out his plans to kill Chapman. In particular, during the attack, Wells gave specific and lucid instructions to his accomplice, casually retrieved his eyeglasses after temporarily losing them, and secured the dayroom door with no indication of panic. Put simply, this evidence does not substantiate Wells's claim that he was acting under extreme duress during the attack.

As for the other statutory mitigator, Wells's conduct during and after the murder reveals that he was aware of the criminal

nature of his conduct. *See Newberry v. State*, 288 So. 3d 1040, 1047 (Fla. 2019) (upholding rejection of substantial-impairment mitigator when defendant's purposeful actions during and after crime revealed awareness of criminality of conduct). During the attack, Wells ignored the instruction of corrections officers to stop the attack, and he prevented them from entering the dayroom until he felt confident that Chapman was dead. Then, after the murder, Wells admitted that the attack was "cold, calculated and premeditated," explaining that he carried out the attack to achieve his goal of being placed on death row. Thus, as demonstrated by his conduct and statements, Wells knew that killing Chapman had specific legal consequences in the criminal context and the record contains competent, substantial evidence inconsistent with the substantial-impairment mitigator.

However, even if the trial court had committed error in rejecting the statutory mitigators, that error would be harmless beyond a reasonable doubt under circumstances of this case. The murder of Chapman was highly aggravated. Indeed, three of the "qualitatively weightiest aggravators in Florida's capital sentencing scheme"—namely the CCP, HAC, and prior-violent-felony

- 21 -

aggravating factors—applied here. *See Allen v. State*, 322 So. 3d 589, 602 (Fla. 2021). What is more, the trial court gave each aggravating factor great or very great weight, while assigning the nonstatutory mitigating circumstances only slight or some weight. Thus, based on these facts, Wells would not be entitled to a reversal even if the court had erred in rejecting the extreme-disturbance and substantial-impairment mitigators. *See Craft v. State*, 312 So. 3d 45, 56 (Fla. 2020).

In sum, Wells is not entitled to relief on this issue either.

**Failure to Make Findings**

Wells also argues that the trial court committed fundamental error in failing to expressly find beyond a reasonable doubt that sufficient aggravating circumstances warranted the death penalty and that such circumstances outweighed the mitigating circumstances. This argument is meritless.

Wells's argument depends on the premise that the sufficiency and weighing determinations called for by section 921.141, Florida Statutes (2021), are elements of the crime of capital murder and, as a result, require proof beyond a reasonable doubt. We have rejected that premise time and again, consistently holding instead that

- 22 -

neither the sufficiency nor weighing determination is subject to the reasonable-doubt standard. *See, e.g., Rogers v. State*, 285 So. 3d 872, 885-86 (Fla. 2019); *State v. Poole*, 297 So. 3d 487, 502-03 (Fla. 2020); *Deviney v. State*, 322 So. 3d 563, 572 (Fla. 2021); *Bell v. State*, 336 So. 3d 211, 217-18 (Fla. 2022). Though Wells argues that our case law is wrong, he has provided us with no substantial reason to question our prior holdings. *See McKenzie v. State*, 333 So. 3d 1098, 1105-06 (Fla. 2022) (declining to revisit *Poole*); *Davidson v. State*, 323 So. 3d 1241, 1248 (Fla. 2021) (finding that arguments comparable to Wells's did not present compelling reason to recede from *Poole*).

As part of his failure-to-make-findings argument, Wells criticizes the sentencing order for not containing express findings as to the sufficiency of the four aggravating factors. Though the trial court did not specifically say that these four factors were "sufficient . . . to warrant the death penalty," *see* § 921.141(4), the sentencing order did, in fact, contain findings that all four aggravating factors were proven beyond a reasonable doubt. *Cf. Poole*, 297 So. 3d at 502 (noting that sufficiency for purposes of section 921.141 means "one or more" aggravating factors; rejecting argument that

- 23 -

sufficiency demands *qualitative* analysis).  But even if sufficiency in section 921.141(4) has a qualitative component, the court's finding that the four aggravating factors "far outweigh[ed]" the mitigating circumstances—coupled with the particular aggravators found and the weight individually assigned to them—necessarily implied that the court found the aggravating circumstances to be sufficient in a qualitative sense to warrant the death penalty in this case.  Thus, assuming there was error due to the absence of a separate sufficiency finding, that error did not rise to the level of fundamental error.  *See Smith v. State*, 320 So. 3d 20, 28 (Fla. 2021) ("In capital cases, a fundamental error is one that is 'so significant that the sentence of death "could not have been obtained without the assistance of the alleged error." ' " (quoting *Poole v. State*, 151 So. 3d 402, 415 (Fla. 2014))).

Since Wells's arguments are inconsistent with our case law and otherwise lack merit, they do not support relief.

**Facial Overbreadth Challenge**

As the first constitutional challenge to his death sentence, Wells argues that Florida's death-penalty statute is facially unconstitutional under the Eighth Amendment.  This constitutional

infirmity, Wells contends, stems from the sheer number of aggravating factors in the statute combined with our holding in *Lawrence v. State*, 308 So. 3d 544, 552 (Fla. 2020) (finding comparative proportionality incompatible with conformity clause in article I, section 17 of Florida's constitution). We disagree with Wells's argument.

We have repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty. *See Johnson v. State*, 969 So. 2d 938, 961 (Fla. 2007); *Miller v. State*, 926 So. 2d 1243, 1260 (Fla. 2006). We have done so recently—even with the statute in its current form. *See Joseph v. State*, 336 So. 3d 218, 227 n.5 (Fla. 2022); *Cruz v. State*, 320 So. 3d 695, 730 (Fla. 2021); *Colley v. State*, 310 So. 3d 2, 15-16 (Fla. 2020); *Bush v. State*, 295 So. 3d 179, 214 (Fla. 2020); *cf.* Ch. 2019-167, § 129, Laws of Fla. (most recent legislation involving death-penalty statute; merely reenacting subsection (9) of statute); Ch. 2010-120, § 1, Laws of Fla. (most recent change to aggravating factors; adding a sixteenth factor).

*Lawrence*'s abandonment of comparative proportionality review does not alter our analysis. In receding from case law to the contrary, *Lawrence* recognized that comparative proportionality review was not an integral component of the Eighth Amendment. 308 So. 3d at 548-50, 552. Accordingly, our abandonment of this type of review does not bolster Wells's Eighth Amendment challenge. And Wells provides no pre- or post-*Lawrence* case law undermining that conclusion.

For the reasons above, Wells has failed to establish a constitutional defect with Florida's death-penalty statute. Accordingly, he is not entitled to relief on this issue.

### Extension of *Atkins v. Virginia* to the Mentally Ill

Wells also argues that he is exempt from the death penalty because he has a serious mental illness. According to him, *Atkins v. Virginia,* 536 U.S. 304 (2002) (holding that federal constitution prohibits execution of individuals who are intellectually disabled), should be extended to categorically bar imposition of the death penalty on those who suffer from serious mental illness. Wells's argument lacks merit.

We have consistently refused to extend *Atkins*. *See Lawrence v. State*, 969 So. 2d 294, 300 n.9 (Fla. 2007); *Schoenwetter v. State*, 46 So. 3d 535, 562-63 (Fla. 2010); *Muhammad v. State*, 132 So. 3d 176, 207 (Fla. 2013); *Dillbeck v. State*, No. SC23-190, 2023 WL 2027567, at *4 (Fla. Feb. 16, 2023) (citing *Gordon v. State*, 350 So. 3d 25, 37 (Fla. 2022)). We are not alone in this respect. State and federal courts alike have uniformly rejected arguments similar to the one Wells now advances. *See Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005); *State v. Dunlap*, 313 P.3d 1, 36 (Idaho 2013); *Matheney v. State*, 833 N.E.2d 454, 458 (Ind. 2005); *State v. Kleypas*, 382 P.3d 373, 447-48 (Kan. 2016); *Dunlap v. Com.*, 435 S.W.3d 537, 616 (Ky. 2013); *State v. Mammone*, 13 N.E.3d 1051, 1089-90 (Ohio 2014); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012); *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1370 (11th Cir. 2009); *United States v. Akbar*, 74 M.J. 364, 406 (C.A.A.F. 2015).

Based on the foregoing authority, we reject Wells's second constitutional challenge.

## Voluntariness of Plea

In death-penalty cases, we have "a mandatory obligation to independently review the sufficiency of the evidence underlying [a first-degree murder] conviction, and the 'customary review' evaluates whether the conviction is supported by competent, substantial evidence." *Davidson*, 323 So. 3d at 1250 (alteration in original) (quoting *Santiago-Gonzalez v. State*, 301 So. 3d 157, 180 (Fla. 2020)). But when, as here, a defendant's guilty plea results in the death-eligible conviction, we instead review the record to determine whether the defendant made that plea knowingly, intelligently, and voluntarily. *Doty v. State*, 170 So. 3d 731, 738 (Fla. 2015). In carrying out this review, we "scrutinize the plea to ensure that the defendant [1] was made aware of the consequences of his plea, [2] was apprised of the constitutional rights he was waiving, and [3] pled guilty voluntarily." *Fletcher v. State*, 343 So. 3d 55, 60 (Fla. 2022) (alterations in original) (quoting *Ocha v. State*, 826 So. 2d 956, 965 (Fla. 2002)).

In this case, the trial court conducted an extensive plea colloquy. During that colloquy, the court apprised Wells of the constitutional rights he would forfeit based on the guilty plea. The

- 28 -

court also accurately informed Wells of the two potential sentencing outcomes resulting from such a plea—life in prison or the death penalty. The court also assured itself that Wells was in satisfactory physical and mental health to make this decision. And for his part, Wells confirmed that he was making the plea freely, knowingly, intelligently, and voluntarily—with a full understanding of the significance of the guilty plea and the rights he was giving up. Finally, the evidence of Wells's guilt was overwhelming, including video evidence of the brutal murder, his unsolicited incriminating statements on the day of the murder, and his post-*Miranda* confession.

Thus, having independently reviewed the record, we conclude that Wells's guilty plea was knowingly, intelligently, and voluntarily given.

## CONCLUSION

Based on our analysis above, we affirm Wells's first-degree murder conviction and sentence of death.

It is so ordered.

MUÑIZ, C.J., and CANADY and COURIEL, JJ., concur.
LABARGA, J., concurs in result with an opinion.
FRANCIS, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

Because I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned this Court's decades-long practice of comparative proportionality review in direct appeal cases, I can only concur in the result.

An Appeal from the Circuit Court in and for Bradford County,
    Mark W. Moseley, Judge
    Case No. 042019CF000706CFAXMX

Jessica J. Yeary, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Tallahassee, Florida,

    for Appellant

Ashley Moody, Attorney General, and Janine D. Robinson, Assistant Attorney General, Tallahassee, Florida,

    for Appellee